**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

XIAO YE BAI,

                             Petitioner,

     v.

BRIAN WILLIAMS,[1] *et al.*,

                         Respondents.

Case No. 2:20-cv-2042-KJD-NJK

**<u>ORDER</u>**

**I.     Summary**

In 2012, a Nevada jury convicted petitioner Xiao Ye Bai of, among other things, first-degree murder with use of a deadly weapon, arising from incidents that culminated in Bai stabbing three individuals, killing one of them, at a Las Vegas nightclub. The State sought the death penalty claiming Bai was a gang-hitman who killed the deceased for nonpayment of debt to the gang. Bai claimed he stabbed the three individuals in the heat of passion in his quest to collect money the deceased owed to Bai's father. The State sought capital punishment for the first-degree murder conviction, but the jury issued a sentence of life without the possibility of parole for that offense.[2]

Bai seeks a writ of federal habeas corpus under 28 U.S.C. § 2254, claiming violations of his constitutional rights for denial of a trial continuance to secure witness testimony, exclusion of expert testimony, admission of evidence, prosecutorial misconduct, failure to dismiss an alternate juror, ineffective assistance of trial and appellate counsel, and cumulative error. This matter is before the Court for a determination of the merits of the petition. The Court denies the writ and grants a certificate of appealability for Grounds 1(A)(1), 1(B), 2(A), 2(B), 3(D)(2)(b), and 7.

---

[1] The state-corrections department's inmate-locator page states Bai is incarcerated at High Desert State Prison. The department's website reflects Brian Williams is the warden for that facility. *See* HDSP_Facility (nv.gov). The Court will direct the Clerk of the Court to substitute Brian Williams for Respondent Calvin Johnson, under, *inter alia,* Fed. R. Civ. P. 25(d).

[2] A capital jury found the murder willful, deliberate and premeditated *and* committed during the perpetration or attempted perpetration of burglary, and sentenced Bai to life without the possibility of parole. (ECF Nos. 14-3; 44-5 at 4; 47-2 at 8.)

## II.    Background[3]

Bai's girlfriend, Pei Pei,[4] testified Bai moved from California to Las Vegas, Nevada in December of 2008. Pei said Bai played a video game called "Hitman" on his computer, always carried a knife, and possessed two firearms. Pei believed Bai was not a gang member, but said Bai was "very close" with a United Bamboo gang member known as, "Brother Three." Pei said Bai lived in Las Vegas with a friend of Brother Three and later moved to a house where Brother Three paid some of the rent. Pei never overheard calls between Bai and Brother Three because, as was Bai's custom with "almost everybody," Bai took calls, with the fan turned on, in the bathroom. Pei said Brother Three visited Bai in Las Vegas "one or two" times and she saw them together at a Las Vegas karaoke bar called Forbes KTV. (ECF No. 42-3 at 41–45, 70–72, 145–48, 172–73.)

Upon Pei's arrival in Las Vegas in 2009, Pei and Bai lived in a house with Li Lu ("Sophia") and Jacky Wang ("Jacky"). Pei and Sophia waitressed for a week at a karaoke bar called Club 108, where Pei met a man named Wen Ju Li. The Club 108 owner told Pei that Li ran a "dauma" scam, i.e., whereby a group of gamblers obtain chips on fraudulent credit, pretend to lose at a casino, withdraw the remaining cash from the casino, and then flee to China, leaving the casino and credit card companies without recourse to collect the debt. Pei told Bai she was fired from Club 108 because Li "asked the owner to talk to [her] about having sex with him," and Pei refused to do so. Pei said she saw Li with someone who had a gun and told Bai that Li hired people to kill someone. At the time, Pei was unaware Bai and Li knew each other. Pei said Bai told her, "there is this guy, he owe[s] him some money and . . . when he get it back, we can use those [sic] money to pay the rent." Bai told Pei the man who owed him money was involved in "dauma," but did not tell her how much or why the man owed him money. (*Id.* at 45–57.)

[3] The Court summarizes the relevant state-court record for consideration of the issues in the case. The Court makes no credibility or factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked the evidence in considering the claims.

[4] On the first day of trial, codefendant Pei pleaded guilty to extortion, conspiracy to commit kidnapping, and accessory to murder, for her part in the offenses charged against Bai. (ECF Nos. 41-2 at 6–10, 41–42; 43-3 at 38–39.)

The defense called Wang Yong who testified he knew Bai and his family in China. In 2002, Yong was in the United States and delivered food to a restaurant that employed Bai's father [Fei Xiang Bai]. Yong believed Li could help Bai's father obtain credit so Bai's father could leave his job for a better one and obtain "a medical card" for needed medical care. Yong said he arranged an introduction of Bai's father to Li, and Li required Bai's father pay $10,000 to "start the process." Yong saw Bai's father give the cash, which was wrapped in newspaper, to Li, and was aware that Li did not fulfill his promises. (*Id.* at 195–209.)

### A.      Bai beat Li and demanded $10,000.

Pei testified that in May of 2009, she and Bai went to 99 Ranch Market for groceries. As they were leaving, Bai told her to stop, and he exited the vehicle. Bai returned with Li, whom Pei recognized from Club 108, and the men entered the backseat of her car. Li recognized Pei, and Bai realized Li was the person who propositioned Pei at Club 108. Pei said she heard Bai tell Li, "so you got money to pay for the sex and you don't have money to pay me back . . . ." Pei testified Bai asked Li to pay back the money, Li denied having money, and "Bai just like punched him," and threatened to break his legs if he did not pay the money. Pei said Li told Bai he would pay if they went across the street to the Bank of America, and Pei drove them there. Pei said Bai again punched Li while Li was on the telephone telling a woman, whom Li said was his wife, to "get $10,000 from the bank and give it to Bai." (ECF No. 43-3 at 57–64, 134–36.)

Wei Yue Wang testified Li was her daughter's father. Wang said she accompanied Li to the 99 Ranch Market, Li went inside to buy a newspaper, but Li did not return to her car. Instead, Li telephoned Wang and told her to go to the Bank of America, withdraw $10,000, and give it to Bai. Wang said Li sounded "[k]ind of excited, nervous, and afraid," and when she saw him, his face was "swollen" because he had been "beaten." Wang testified Li later explained to her that Bai beat him because Li offended Brother Three, who was the "number one; the leader of the gang." Li told Wang he did not owe Bai money; rather, Bai wanted money because "[h]e's in the gang," and the dispute concerned what Li "was doing." (ECF No. 41-2 at 70–78, 82–88, 105–06.)

Pei testified the bank was closed and Li offered to "pay his money back" "in a day or two." Bai said nothing to Pei about Li possibly having a bodyguard but told her Li "owes a lot of people

money." Pei said when Li did not pay, Bai asked roommates Sophia and Jacky to call him if they spotted Li, and Pei said she once looked for Li inside a casino. (ECF No. 43-3 at 65–70, 150–51.)

### B.     Bai killed Li and injured two others at Forbes KTV.

Jian Xiong Guo testified he and Li were friends and Guo had "quite often" seen Li with a white policeman who carried a firearm whom Guo learned was Li's bodyguard. Guo said he and Li went to Forbes KTV in the early morning hours of July 6, 2009, but the bodyguard was not with them. Anthony Siu testified he, Sophia, and a woman named Lin Yao,[5] were at Forbes KTV that night entertaining Siu's client in a private room. At one point, Yao went to the dance floor area of the main bar. (ECF Nos. 37-1 at 12, 17; 41-4 at 12–19, 40–41, 46; 42-1 at 38–39.)

Pei testified Bai told her to drive him to Forbes KTV that night to look for Li. On the way, Bai was on the telephone "asking if Li still [sic] in the bar and who he with [sic]." Upon arrival, Bai asked Pei to see if Li was inside the bar. Pei entered the bar, but "felt like something bad going [sic] to happen" and returned to her car where Bai was on the telephone to "either Jacky or Sophia" asking if Li was inside the bar. Bai entered the bar after Jacky and Sophia left in Jacky's vehicle. (ECF No. 43-3 at 79–83.)

Guo testified he was smoking near the dance floor inside Forbes KTV when Li "all of sudden show up and stand next to [him]." Guo said Li was talking with [Bai], and Guo "thought they were friend [sic] just have [sic] a conversation," however; "[a]fter a few seconds, [Li] pull [Guo's shoulder]—to put [Guo] in front of [Li]." Guo said the two men "just keep [sic] talking real loud," and he didn't hear what they said, but "[i]t looked like they had some type of quarrel." Guo testified he "thought they got a fight [sic] because something like wan zi; return the money, return the debt." Guo also testified he told police he thought Li "argued with people over money." Guo said he felt "very intense," "like there's going to be an argument or fight" and tried to eliminate the tension by saying "calm down, calm down," and "you want to say something, just calm down." Guo said [Bai] "put his hand in his back," like "he's pulling something from behind." Guo became nervous and raised his hand while Li got behind Guo, so Guo was between the two

---

[5] Lin Yao's videotaped deposition testimony was presented at trial. (ECF Nos. 36-16 at 5; 37-1; 37-2.)

men, and then [Bai] stabbed or slashed Guo's hand with a knife. Guo said Li ran away, Bai chased after him, Li fell, and Guo left the club. (ECF No. 41-4 at 21–30, 36–37, 47, 76.)

Yao testified she was near the dance floor when "the next thing" she knew Bai "was chasing" Li around a booth, and then Li was on the ground with Bai on top of him hitting Li "a lot of time [sic]," and "he was just [sic] keep going [sic] at it." Yao said she was "very close" to Bai when Bai hit Li, but she did not see a weapon in Bai's hands. Yao said the music was "loud, so it's very hard to hear" and she "didn't hear any arguments or anything." Yao "went up to them" and "screamed" for them to stop but Bai "just got up." Yao thought Bai was going to hit her, so she "blocked" with her arm, and then realized she "got a cut" and "started bleeding," so she ran to Siu's private room for help. Siu testified Sophia returned to the private room with a "six-inch cut on her back," and told Siu there was a fight. Siu left the room, and saw Li "on the dance floor, bleeding," and "shivering," and "a big pile of blood . . . ." Siu ran outside, saw nothing, returned inside, and found Li motionless. (ECF Nos. 37-1 at 17–28; 42-1 at 45–46.)

Pei testified she started her vehicle when someone "come [sic] to get the bouncer" because she "felt like they got into a fight" and "they might call the police." Bai entered Pei's vehicle and Pei drove home. Pei said Bai was "kind of angry," "excited," and "yelling." Pei said Bai never told her anybody was going to be killed and she did not know Li was dead. Pei and Bai took a bus to Brother Three's house in Los Angeles. Pei and Brother Three later retrieved Pei's car in Las Vegas and drove back to California. Pei and Bai stayed in California a week during which Bai was with Brother Three. Police located Pei and Bai and confiscated Pei's cellular telephone, which contained Brother Three's telephone number. (ECF No. 43-3 at 84–92, 131–32, 164–65, 170–71.)

Clark County forensic pathologist Larry Simms concluded Li died from blood loss occasioned by "multiple sharp force injury." Simms identified approximately 32 stab wounds, incise wounds, abrasions, and superficial wounds, on Li's body, including one lethal wound to Li's left chest, caused by a four to five-inch blade, that penetrated "through the lung and into the heart" causing "a large amount of blood loss." (ECF Nos. 41-4 at 93–123; 42-2 at 77–78.)

### C.    Gang Evidence

Los Angeles County Sheriff's Department detective Tom Yu was asked to assist in the

investigation. Yu is of Chinese descent, speaks Mandarin Chinese, and investigates crimes committed by Asian gang members. Yu encountered Bai in November of 2008, when Bai disclosed that he was a member of the United Bamboo Criminal Street Gang. Yu explained that Asian gangs "don't claim a street" or "neighborhood," and "don't generally mark graffiti[ ] on the street." He said they are "money oriented" and "strive on making money, profiting from the money and advancing the gang by making money for the gang," through fraud, narcotics, firearms trafficking, and extortion. Yu testified that Brother Three was the "shot[-]caller" for United Bamboo. Yu said Bai, Li, and Brother Three, were from the same Chinese province, and at the time of Bai's trial, Brother Three was in China. Yu said, "someone like Li would have to pay taxes . . . to Brother Three"; nonpayment is an "ultimate disrespect" that requires a remedy; and Yu found no evidence Li owed Bai's father money. (ECF No. 42-1 at 93–98, 105–11, 146–148, 153–56, 193, 197.)

## III.   Governing Standards of Review[6]

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides the legal standards for consideration of the Petition:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable

---

[6] Bai asserts the standard of review in 28 U.S.C. § 2254(d) violates the Constitution, e.g., the Suspension Clause (Article One, Section Nine, clause two); fundamental principles of separation of powers (Articles One, Two, and Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of due process (Amendments Five and Fourteen). Rule 2(c) of the Rules Governing Section 2254 Cases ("Habeas Rule(s)") require a federal habeas petition specify all grounds for relief and "the facts supporting each ground." Although *pro se* pleadings must be liberally construed, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), conclusory allegations unsupported by specific facts may be summarily dismissed. *Mayle v. Felix*, 545 U.S. 644, 649, 655–56 (2005); *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Bai concedes the Ninth Circuit Court of Appeals rejected arguments that AEDPA violates the Suspension Clause and separation of powers. *See Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007). Bai cites no specific facts supporting these claims, and Respondents did not address the claims. (ECF Nos. 24 at 11; 79.) The Court will dismiss the claims as conclusory.

determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly-established Federal law as determined by the Supreme Court, under 28 U.S.C. § 2254, "[i]f the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is based on an unreasonable application of clearly established Federal law as determined by the Supreme Court, under 28 U.S.C. § 2254(d), "[i]f the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409) (internal citation omitted).

Where no holding of the Supreme Court states a particular standard or rule at the time of the state court's decision, then a petitioner cannot establish, as required by AEDPA, that the state court's decision was either contrary to or an unreasonable application of clearly established Federal law. *See, e.g., Carey v. Musladin*, 549 U.S. 70, 76–77 (2006); *see also Williams*, 529 U.S. at 412 (interpreting "[t]he meaning of the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States'" contained in 28 U.S.C. § 2254(d)(1) as referring to "[t]he holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state-court decision.") (emphasis in original). State courts are not required to cite Supreme Court cases, or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 357 U.S. 3, 8 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated, "[e]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet, and highly deferential standard for evaluating state-court rulings, which demands state-court decisions be given the benefit of the doubt.") (internal quotation marks and citations omitted).

On federal-habeas review, "petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Davis v. Ayala*, 576 U.S. 257, 268–69 (2015) (internal quotation marks omitted) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (holding the harmless-error standard for constitutional errors on collateral review is whether the error "had substantial and injurious effect or influence in determining the jury's verdict."); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1517 (2022) ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA."). Although a federal habeas petitioner must meet the *Brecht* standard, that does not mean the state court's harmlessness determination has no significance. *Id.* at 268. Non-structural trial error of a constitutional dimension raised on direct appeal is subject to the "harmless beyond a reasonable doubt" prejudice standard enunciated in *Chapman v. California,* 386 U.S. 18, 24 (1967), whereas non-constitutional errors are reviewed under the harmless error test set forth in *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946), i.e., whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Thus, for instance, where there is a trial error of constitutional dimension, and AEDPA governs, as a precondition to the application of *Brecht* to the error for federal habeas corpus purposes, a federal habeas court must find, in accordance with AEDPA and where applicable, that the state court's decision applied *Chapman* in an objectively unreasonable manner. *Ayala*, 576 U.S. at 269–70 (citations and quotation marks omitted).

The Supreme Court has held that where a petitioner fairly presented a claim to the state court, and the state court addressed a related claim, but did not expressly acknowledge that it decided the claim in question, a federal habeas court "must presume that the federal claim was

adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). This is especially true where the "claims are so similar mak[ing] it unlikely that the [state appellate court] decided one while overlooking the other." *Id.* at 305; *see, e.g.*, *Bell v. Uribe*, 748 F.3d 857, 863–64 (9th Cir. 2014) (holding Nevada Supreme Court adjudicated claim of ineffective assistance of counsel where petitioner's due process and ineffective assistance claims were "so intertwined" it was unlikely the state court decided the due process claim while overlooking the ineffective assistance of counsel claim) (citing *Richter,* 562 U.S. at 99–100).

Where no decision from the state court explains its underlying reasoning, a federal habeas court must "engage in an independent review of the record" to determine whether the state court's decision on the claim was "objectively unreasonable." *Kipp v. Davis*, 971 F.3d 939, 948 (9th Cir. 2020) (citing *Murray v. Schriro* ("*Murray II*"), 882 F.3d 778, 802 (9th Cir. 2018) (quoting *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (relying on *Richter*, 562 U.S. at 99–101)). "This is not de novo review"; rather, it must be determined "what arguments could have supported the state court's decision and assess whether fairminded jurists could disagree whether those arguments are unreasonable." *Kipp*, 971 F.3d at 948; *see also Richter*, 562 U.S. at 102.

## IV.   Discussion

### A.   Ground 1—Denial of Trial Continuance and Exclusion of Expert Testimony

Bai alleges the trial court violated his rights to due process, present witnesses, and present a complete defense in violation of the Fifth, Sixth, and Fourteenth Amendments by (A) denying a trial continuance to secure the testimony of his father; and (B) excluding expert testimony on fight-or-flight response. Respondents contend the trial court did not violate due process. (ECF Nos. 24 at 12–17; 79 at 20–27; 82 at 4–9.)

#### 1.   Additional Governing Principles

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations and quotation marks and other citations omitted). This guarantee includes, "at a minimum . . . the right to put before a jury evidence that

might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987) (footnote omitted); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (stating, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense" and holding exclusion of third-party confession together with rule prohibiting cross-examination to reveal the prior confession, resulted in denial of a fair trial in violation of due process) (citations omitted); *Washington v. Texas*, 388 U.S. 14, 19 (1967) (stating, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies" and a defendant's right to present his own witnesses to establish a defense "is a fundamental element of due process of law.").

"[T]he right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers*, 410 U.S. at 295); *see also Clark v. Arizona,* 548 U.S. 735, 770 (2006) (explaining the right to present evidence may give way to a State's evidentiary and procedural rules). In exercising the right to present witnesses, "[t]he accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers,* 410 U.S. at 302. "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–69 (1991.) However, "[r]estrictions on a criminal defendant's rights to . . . present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Lucas*, 500 U.S. at 151 (citing *Rock*, 483 U.S. at 56). Where a trial court commits a constitutional error in excluding evidence, federal-habeas relief is warranted only if that error had "a substantial and injurious effect or influence" on the jury's verdict. *See Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) (holding *Brecht* applies in federal habeas corpus cases).

### 2.      Ground 1(A)—Denial of Trial Continuance

Bai claims the trial court violated his right to present witnesses in support of his defense when it denied a 90-day trial continuance so Bai's father could obtain the necessary visa to travel

from China to testify at Bai's trial. In Ground 1(A)(1),[7] Bai argues his father's testimony was critical during the guilt phase of the trial to establish Bai's state of mind about Li's fraudulent taking of $10,000 from Bai's father. In Ground 1(A)(2), Bai argues his father's testimony was critical during the penalty phase to establish his father's physical abuse of Bai during Bai's childhood caused Bai frontal lobe impairment. (ECF No. 24 at 12–15.) For the reasons discussed below, Bai is not entitled to federal habeas corpus relief for Ground 1(A).

"The matter of continuance is traditionally within the discretion of the trial judge . . . ." *Ungar v. Sarafite*, 376 U.S. 575, 589–90 (1964) (holding denial of continuance to hire counsel was not a due process violation because defendant was afforded sufficient time to hire counsel who would be available at the time of the scheduled hearing) (citation omitted). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.* (citations omitted.) Only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" does a due process violation occur. *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (citing *Ungar*, 376 U.S. at 589). "The concept of fairness, implicit in the right to due process, may dictate that an accused be granted a continuance in order to prepare an adequate defense." *United States v. Bogard,* 846 F.2d 563, 566 (9th Cir. 1988), *superseded on other grounds as noted in Simpson v. Lear Astronics Corp.,* 77 F.3d 1170, 1174 (9th Cir. 1996).

Bai's trial was initially set for March of 2010, and continued to August of 2010, March of 2011, and March of 2012. In February of 2012, the defense moved to continue trial stating the mitigation investigator would not be ready as they had "[a] lot of people that are going back to China" and the "mitigation expert's having a lot of difficulty." The state district court inquired, "[H]ave you had any contact" "as far as the County putting up money for someone to fly out to China?" Defense counsel replied, "I haven't. I've been told that's not an option, so what we're trying to do is conduct telephonic interviews which is proving to be difficult . . . ." The court

---

[7] For purposes of clarity, the Court subdivides Ground 1(A) in this Order.

granted the request for continuance and set trial in November of 2012. In May of 2012, the defense informed the state district court that all necessary witnesses were located, the mitigation expert will be ready, and they were "99 percent sure" they would be ready on the scheduled trial date. The following August, the parties confirmed their experts were ready for trial. In late October of 2012, the defense moved for a 90-day trial continuance to obtain a travel visa so Bai's father could travel from China to testify at Bai's trial. Counsel explained "the critical nature" of his testimony was discovered in "recent interviews." The trial court denied the motion because the trial date was reset several times and witnesses' failures to cooperate with counsel are not good cause to continue trial. (ECF Nos. 25-6 at 4; 33-1 at 8, 38–46, 62, 75–76; 37-4 at 3–5; 37-12 at 3; 37-14 at 40–41.)

On the first day of trial, Bai moved for reconsideration of trial continuance arguing the testimony of Bai's father was essential for the mitigation phase of the trial. The defense explained the Office of Appointed Counsel denied a request for funds to send a mitigation expert to China, so the defense relied on Bai's friends and family to communicate with witnesses in China. The defense explained witnesses were suspicious of contact from foreign attorneys and Bai and his mother were estranged from Bai's father. The defense said it was not until Bai's mother travelled to China in September of 2012, found Bai's father, and persuaded him to testify, that Bai's father agreed to do so. Counsel consulted the Chinese consulate and an immigration lawyer, who assured the travel visa could be obtained within 90 days. The defense argued it was critical to obtain testimony from Bai's father about the beatings he imposed on Bai when Bai was a child, to support the neuropsychologist's testimony that Bai suffered brain damage. The State opposed continuance arguing it was impossible to know how long it would take to obtain a travel visa, and suggested Bai's father provide video testimony for the penalty phase as there are "no confrontation clause problems, there's no hearsay problems, there's no cross-examination problems." The trial court concluded defense counsel was not dilatory but stated, "[i]t sounds like [the prosecutor] says right now if he can get in front of a video camera, tape it, Federal Express it here, we would have it here in the next four weeks." The court asked defense counsel whether there was "a guarantee that he's going to get his visa" by March 3, 2013. The defense agreed there was no guarantee but said the immigration lawyer said it was a "near certainty." The court denied the motion concluding,

"[t]here's no guarantee in my mind that he can be here. There's other avenues to present this testimony from either uncles, neighbors, teachers, video conference, video link, perhaps even a video link so it's live testimony . . . ." (ECF Nos. 38-11 at 5; 38-12 at 5–14.)

On direct appeal, the Supreme Court of Nevada determined denial of the request for trial continuance was not an abuse of discretion because the defense had three years to arrange witness travel, the requested continuance was lengthy, and others could provide the desired testimony:

> *Request for continuance*
>
> Bai brought his motion for a "several month[ ]" continuance eleven days before his trial, which had been pending for three years. Bai contends that the district court erred by denying his motion because the continuance would have allowed time for his father to travel from China to testify to the debt Li owed and the brain injury Bai suffered. "[G]ranting or denying a motion for a continuance is within the sound discretion of the district court." *Mulder v. State,* 116 Nev. 1, 9, 992 P.2d 845, 850 (2000). When reviewing a district court's decision to grant or deny a continuance, we consider the (1) prejudice to the court, (2) prejudice to the defense, and (3) defendant's diligence in attempting to secure witnesses. *See Lord v. State,* 107 Nev. 28, 42, 806 P.2d 548, 557 (1991).
>
> In *Lord,* the district court denied the defendant's request for a half-day continuance to allow for his witnesses to travel to Nevada to testify at the penalty hearing. *Id.* at 32, 806 P.2d at 550. We determined that a district court may abuse its discretion by failing to grant a reasonable and modest continuance when the request is made to obtain important witnesses and when the requesting counsel or parties are not responsible for the delay. *Id.* at 42, 806 P.2d at 556–57. However, in *Mulder,* prior to the penalty phase, the request for a sixty-day continuance was not modest, and the delay was Mulder's fault because he was not cooperating with his attorneys. 116 Nev. at 10, 992 P.2d at 850. Three witnesses also testified to mitigating circumstances at sentencing, and Mulder failed to fully explain any additional mitigating evidence that would have been presented had the court granted the continuance. *Id.* at 10, 992 P.2d at 850–51.
>
> This case is distinguishable from *Lord* and comparable to *Mulder.* In *Lord,* the modest request for a continuance was for a half-day, whereas here, the request was for "several months," an even lengthier request than the sixty days we determined was not a modest request in *Mulder.* Thus, here, the request is also not a modest one. Additionally, unlike *Lord* but similar to *Mulder,* the defense was responsible for the delay. The defense had three years to prepare for trial and arrange for the travel of witnesses. Lastly, similar to *Mulder* but distinct from *Lord,* here, other witnesses, including Bai's mother, could have testified to both the debt and the brain injury. Therefore, as in *Mulder,* the district court did not abuse its discretion by denying Bai's motion to continue the trial.

(ECF No. 14-6 at 4–5 (footnote omitted).)

### a.    Ground 1(A)(1)—Denial of Trial Continuance for Guilt Phase

The Supreme Court of Nevada's determination that Bai's mother could testify, during the

guilt phase of the trial about Li's debt to Bai's father constitutes an unreasonable determination of fact in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(d)(2). Yong testified Bai's father made the arrangement with Li in 2002. *See supra*, at p. 3. Bai's mother did not testify during the guilt-phase of the trial, and during the penalty phase Bai's mother testified she came to the United States in 2005. (ECF No. 46-4 at 32.) Nothing in the state court record suggests Bai's mother was aware of the alleged debt. Nevertheless, as discussed below, the Supreme Court of Nevada's alternative determination of fact, that "other witnesses," could testify about the debt, underlying its denial of this claim, was objectively reasonable. Accordingly, the Court applies deferential review to rejection of the claim in accordance with AEDPA.

The Supreme Court of Nevada could reasonably determine the denial of the request for trial continuance to secure the testimony of Bai's father about the alleged debt was not fundamentally unfair in violation of due process and did not deprive Bai his right to present witnesses and a complete defense. *Richter*, 562 U.S. at 102. The trial court's reasons for the denial were reasoned and non-arbitrary under the circumstances of the case. The request for continuance came late in the proceedings. During the summer before trial, the defense assured the trial court all necessary witnesses were available, and the defense would be ready for trial in November of 2012. Although the defense lacked funds to send an expert to China, as the trial court noted, nothing established Bai, his friends, mother, and counsel, were prevented from earlier locating Bai's father and securing his willingness to testify. Moreover, the trial court indicated a willingness to grant a shorter four-week continuance to permit the defense to obtain video testimony, but the defense did not pursue that alternative. The denial of the continuance also did not prevent Bai from presenting testimony confirming the alleged debt to support his defense that he killed Li and harmed others in the heat of passion during an attempt to regain his father's money. Bai presented the testimony of Yong, a percipient witness to the alleged fraud, who testified that Li swindled Bai's father and owed him $10,000. Thus, the Supreme Court of Nevada's determinations are neither contrary to, nor constitute an unreasonable application of clearly established Federal law, as determined by the Supreme Court and the claim was not rejected based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. Bai is

not entitled to federal habeas corpus relief for Ground 1(A)(1). The Court will issue a certificate of appealability as Bai has demonstrated the denial of a constitutional right and reasonable jurists could debate the correctness of the Court's determination that the state supreme court's denial was objectively reasonable. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

> **b.      Ground 1(A)(2)—Denial of Trial Continuance for Penalty Phase**

The Supreme Court of Nevada could reasonably conclude the denial of a trial continuance to secure the testimony of Bai's father for the penalty phase did not render the trial fundamentally unfair and did not violate Bai's right to present witnesses in support of his defense. *Richter*, 562 U.S. at 102. The trial court's bases for denying the continuance were reasoned and non-arbitrary. The defense claimed Bai's father was a critical witness for mitigation concerning Bai's childhood abuse at the hands of his father who caused him brain damage. The trial court was concerned about the possibility of an indefinite trial-delay waiting for a travel visa. Although, as the prosecutor and the trial court noted, the defense could have presented Bai's father's testimony during the penalty phase by video given the relaxed evidentiary standards for that phase of the trial, and the trial court indicated willingness to grant a four-week continuance to do so, Bai did not pursue that alternative. The record also shows the denial of the continuance did not prevent Bai from presenting his version of the facts. Bai's mother testified she, Bai's father, and others, beat Bai when he was a child. She testified Bai's father was an alcoholic who beat Bai so hard he broke Bai's eardrum, resulting in a hearing loss. She admitted she personally hit Bai in the head with a baseball bat. Clinical Psychologist Dr. Johnny Wen testified Bai's psychological test results indicate Bai has a frontal lobe deficiency that diminishes his ability to control impulses and act according to instructions even when the instructions are known to him, and that the beatings Bai suffered as a child support that conclusion. (ECF No. 46-1 at 65–92, 159–165.) The Supreme Court of Nevada's determinations as to the denial of a trial continuance for the penalty phase of the trial are neither contrary to, nor constitute an unreasonable application of clearly established Federal law as determined by the Supreme Court and are not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. Bai is not entitled to federal habeas relief for Ground 1(A)(2).

### 3. Ground 1(B)—Exclusion of Expert Testimony

Bai alleges the trial court violated his right to present a complete defense by excluding expert testimony about fight-or-flight response as it would show Bai's conduct at Forbes KTV was consistent with voluntary manslaughter, rather than first-degree murder. (ECF No. 24 at 16–17.)

In Nevada, a defendant who intends to call during his case in chief an expert witness, must timely serve upon an opposing party "a written notice" containing, *inter alia*, "a brief statement regarding the subject matter on which the expert witness is expected to testify and the substance of the testimony." NRS § 174.234(2)(a); *see also Turner v. State*, 136 Nev. 545, 552–55, 473 P.3d 438, 446–48 (2020) (stating NRS § 174.234 "serve[s] to place all parties on an even playing field and prevents trial by ambush or unfair surprise.")

The defense gave notice that it would call three experts: (1) Johnny H. Wen, Ph.D., to "testify as to the evaluation and impact of neurological issues as they affect behavior and impulse control"; and (2) Drs. Norton A. Roitman, M.D. and Dr. Mark Chambers, PhD., to "testify as to effects of neurological damage and behavior." On Day 9 of trial, the State requested the identity and data underlying the defense expert's testimony for the guilt phase of the trial. The defense confirmed, "[T]here's not going to be any testimony presented at this phase featuring any neurological damage." The defense explained that "psychology by definition is the study of human behavior," and the expert could testify about fight-or-flight response based on the testimony at trial, including "30 some odd stab wounds." The State argued such testimony concerned Bai's state of mind when he killed Li and would open the door to evidence of the investigation of Bai and charges that he murdered another individual in California about seven months before Li's death. The defense confirmed it would call no expert were the State allowed to "get into" the other case. The defense asserted the expert would draw no legal conclusions and that it was permissible for the defense to "present our contention that this was a flight or fight situation without opening up any doors . . . ." The defense argued Roitman's testimony would focus on the autopsy report. The State argued the defense provided no notice their expert would testify about fight-or-flight syndrome. After reviewing the defense expert notice, the trial court agreed with the State, explaining, "[f]rom your offer of proof it seems to me that their area of testimony is outside the

scope of the notice of expert witness. So for that reason, I'm going to exclude the testimony . . . ."

(ECF Nos. 25-4; 25-5; 38-2; 38-3 at 3; 39-3; 40-5; 43-3 at 179–89.)

On direct appeal, the Supreme Court of Nevada determined the exclusion of the expert testimony was not an abuse of discretion because expert notice did not, as required by State law, include a statement regarding the subject matter on which the expert was expected to testify and the substance of the anticipated testimony:

> *Expert testimony*
>
> At trial, the district court excluded Bai's experts' testimony, concluding that the experts' testimony on fight or flight response would be outside the scope of Bai's prior notice of experts, which provided that the doctors would testify to "neurology damage and behavior." On appeal, Bai contends that the district court abused its discretion by excluding his experts' testimony, resulting in prejudice. According to Bai, his experts' testimony on "neurology damage and behavior" as it relates to fight or flight response was essential to prove the killing resulted from a mental break, in contradiction to the States' claim that it was a "contract execution" ordered by United Bamboo.
>
> We review the sufficiency of expert witness notice for abuse of discretion. *Perez v. State,* 129 Nev., Adv. Op. 90, 313 P.3d 862, 870 (2013). Here, in light of Bai's offer of proof, and to the extent that a written report was not required, we conclude that his notice of expert testimony did not amount to "[a] brief statement regarding the subject matter on which the expert witness is expected to testify and the substance of the testimony." *See* NRS 174.234(2)(a). No substance was provided. And the notice's bare statement, identifying "neurology damage and behavior" as the subject of testimony, was not sufficient to give notice that the experts would testify to fight or flight response. Therefore, the district court did not abuse its discretion when it excluded Bai's experts' testimony.

(ECF No. 14-6 at 5–6.)

The Supreme Court of Nevada's determination is neither contrary to, nor constitutes an unreasonable application of Federal law, as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. Based on the record, it is objectively reasonable to conclude that Bai's failure to disclose Wen, Roitman, and Chambers would testify about fight-or-flight response constituted a failure to "comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence" required by State law. *See Chambers*, 410 U.S. at 302. The defense expert notices disclosed Wen, not Roitman or Chambers, would testify about the "impact of neurological issues as they affect behavior and impulse control,"

but the defense did not give notice that any of the experts would testify during the guilt phase of the trial, and the defense told the court that the defense would present no witnesses concerning neurological issues during the guilt phase of the trial. Under the circumstances, it is objectively reasonable to determine the imposition or application of § 174.234(2)(a) was not arbitrary or disproportionate to the purposes the state law notice requirements were designed to serve. Accordingly, the Supreme Court of Nevada could reasonably conclude the exclusion of the expert witness testimony about fight-or-flight response during the guilt phase of the trial did not render the trial fundamentally unfair in violation of federal due process. *Richter*, 562 U.S. at 102. Bai is not entitled to federal habeas corpus relief for Ground 1(B). The Court will, however, issue a certificate of appealability for Ground 1(B). Bai has demonstrated the denial of a constitutional right and jurists of reason could debate whether, it is reasonable to determine that, based on the evidence known to the prosecutor about the circumstances of the killing and injuries to bystanders, expert disclosure that Wen would testify about "impulse control" was insufficient to notice that Wen may testify in the guilt phase of the trial about "impulse control" in the context of fight-or-flight response. *Slack*, 529 U.S. at 484 (2000).

**B.      Ground 2—Admission of Evidence**

Bai alleges the trial court violated his rights to due process and a fair trial in violation of the Fifth and Fourteenth Amendments by admitting (A) evidence supporting the State's theory that Bai killed Li in his capacity as a gang-hitman; (B) photographs of Bai dressed as a hitman and his weapons; (C) expert opinion in response to a juror question; and (D) a letter Bai wrote to his mother and Pei's interpretation of that letter. Respondents contend the Supreme Court of Nevada's determinations on these claims were reasonable. (ECF Nos. 24 at 18–24; 79 at 27–33; 82 at 9–19.)

**1.      Additional Governing Principles**

"Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice . . . does the Due Process Clause preclude its admission.'" *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (internal and other citations omitted); *see also Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.") (citing

*Estelle*, 502 U.S. at 67–69). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions." *Estelle*, 502 U.S. at 68. "Admission of evidence violates due process '[o]nly if there are no permissible inferences the jury may draw' from it." *Boyde v. Brown*, 404 F.3d 1159, 1172 (2005) (citation omitted). Even then, the evidence must "be of such quality as necessarily prevents a fair trial." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (citations omitted).

The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing 28 U.S.C. § 2254(d)) ("Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court."); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (explaining the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly").

### 2.      Ground 2(A)—Evidence Supporting Theory Bai was a Gang-Hitman

Bai alleges the trial court violated due process by permitting evidence in the guilt phase of the trial to support the State's theory that Bai killed Li in his role as a gang-hitman. Bai claims the State provided no direct evidence Bai was a hitman, no notice of an aggravating circumstance alleging he murdered Li for monetary gain, and the prejudicial effect of the evidence supporting that theory substantially outweighed its probative value. Bai claims his connection to a gang was parlayed into an unfounded allegation he was a hitman to support the mens rea required for the first-degree murder of Li. Bai furthermore claims the accusations were impermissible "prior bad act" evidence that were probative only of bad character and propensity by suggesting Bai was responsible for other unproven murders and was not probative whether Bai murdered Li. Respondents contend the evidence supporting the argument that Bai was a gang hitman was permissible based on the State's view of the evidence and did not render the trial fundamentally unfair. (ECF Nos. 24 at 18–19; 79 at 29–30; 82 at 10–11.)

In Nevada, a conviction for first-degree murder requires the State to establish, beyond a reasonable doubt, a "willful, deliberate and premeditated killing" by the defendant. NRS § 200.030(1)(a), *as amended by* Laws 2007, c. 35, §1. The State must prove the defendant had "a design to kill" that "was distinctly and rationally formed in the mind of the" defendant "at or before the time the fatal blows were struck." *Briano v. State*, 94 Nev. 422, 425, 581 P.2d 5, 7 (1978). The amount of time between the formation of the design to kill and the killing itself is irrelevant. *Id.* Alternatively, NRS § 200.030(1)(b) "defines first-degree felony murder as a murder that is committed in the perpetration or attempted perpetration of certain enumerated crimes, including burglary." *State v. Contreras*, 118 Nev. 332, 334, 46 P.3d 661, 662 (2002) ("The felonious intent involved in the underlying felony is deemed, by law, to supply the malicious intent necessary to characterize the killing as a murder, and because felony murder is defined by statute as first-degree murder, no proof of the traditional factors of willfulness, premeditation, or deliberation is required for a first-degree murder conviction."). Burglary requires an unlawful entry into a building with the intent to commit . . . assault or battery on any person or any felony. NRS § 205.060(1), *as amended by* Laws, 2005, c. 126, § 1, eff. May 19, 2005.

According to NRS § 48.045(2):

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The Supreme Court has stated:

> The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice. (Footnotes omitted).

*Michelson v. United States*, 335 U.S. 469, 475–76 (1948); *see also, Tavares v. State*, 117 Nev. 725, 730, 30 P.3d 1128, 1131 (2001) ("We have often held that the use of uncharged bad act

evidence to convict a defendant is heavily disfavored in our criminal justice system because bad acts are often irrelevant and prejudicial and force the accused to defend against vague and unsubstantiated charges" and "[t]he principal concern with admitting such acts is that the jury will be unduly influenced by the evidence, and thus convict the accused because it believes the accused is a bad person.").

More than a year before trial, the State noticed Detective Yu as an expert in Asian gangs. An updated notice stated Yu would testify about "the interaction of gang activity and the instant case as well as the case documented under Los Angeles Sheriff's Office file number 008-00146-3199-011." Bai sought preclusion of his "alleged gang affiliation" claiming his gang-affiliation was irrelevant to the charges because the State alleged the motive for killing Li was extortion. The State argued Detective Yu would testify Bai is a member of the United Bamboo gang with close ties to Brother Three, that Brother Three is a loan-shark and shot-caller for the gang, and the State could establish Bai killed Li to carry out his duties as gang member. The State argued Yu's testimony evidenced the crime itself, was relevant to motive, and the probative value was not outweighed by the prejudicial effect. (ECF Nos. 34-22 at 3; 35-1 at 8; 38-7 at 4–5; 40-4 at 2–7.)

At a hearing on the motion, the defense argued for exclusion of evidence of gang affiliation because it was "de[-]facto[-]aggravation evidence," and the State was "saying now for the first time this was a contract hit, a murder[-]for[-]hire, a murder based upon gang affiliation" that was not disclosed as an aggravating circumstance supporting the death penalty. The defense argued if "it's going to be presented to the jury at the guilt phase" then "it's going to be transformed automatically into penalty phase evidence" and there was no notice the State planned to establish murder-for-hire as an aggravating circumstance to support the jury's option to sentence Bai to the death penalty. The State conceded evidence in the guilt phase is admissible in the penalty phase but argued the State did not intend to argue monetary gain as an aggravating circumstance in the penalty phase, and no instruction for an aggravating circumstance based on murder-for-hire need be given to the jury during the penalty phase. The trial court ruled the State was "free to argue the facts of the underlying case" but was not permitted "to argue as an aggravator that this was a murder[-]for[-]hire or hitman[-]situation . . . ." The defense argued the State should not be allowed

to argue in the guilt phase that "this was his job" and "he was paid by Brother Three to commit a murder." The trial court concluded evidence of gang membership was not collateral and admissible based on the State's claims that witnesses would prove Bai's gang membership and that Bai killed Li because Li failed to repay a debt to the gang; however, it ruled the State could not identify that circumstance as an aggravator supporting a death sentence during the penalty phase of the trial. (ECF No. 40-6 at 11–12, 33–46.)

On direct appeal, the Supreme Court of Nevada determined that admission of evidence supporting the State's theory that Bai was a gang-hitman was not an abuse of discretion as it was probative of Bai's motive for killing Li and "the result would be the same" if it had been excluded:

*Gang affiliation and hit man evidence*

Bai contends, generally, that the district court erred when it admitted gang-affiliation evidence and evidence that he was a hit man. Bai also contends, more specifically, that the district court erred when it admitted photographs of him posing as a hit man, and admitted Detective Yu's testimony about Asian gang culture.

This court reviews claims of evidentiary error for an abuse of discretion. *Holmes v. State,* 129 Nev., Adv. Op. 59, 306 P.3d 415, 418 (2013). Thus, "[a] decision 'to admit or exclude evidence will not be reversed on appeal unless it is manifestly wrong.'" *Id.* (quoting *Archanian v. State,* 122 Nev. 1019, 1029, 145 P.3d 1008, 1016 (2006)). NRS 48.035(1) provides in part: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice."

Detective Yu's testimony on the culture of respect in Asian gangs was relevant to understanding motive. *See* NRS 50.275 (providing that if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowledge . . . may testify to matters within the scope of such knowledge").

The evidence of Bai's relationship to United Bamboo and alleged status as a hit man for United Bamboo was probative of Bai's motive for killing Li, such that any prejudice was outweighed. *See Lay v. State,* 110 Nev. 1189, 1195, 886 P.2d 448, 452 (1994) ("The prosecutor was allowed to elicit evidence of motive, but was not allowed to inquire into specific prior criminal acts of the gang at the guilt phase."). In particular, the photographs admitted depicting Bai in all black and posing with weapons, ostensibly mimicking ideations of a hit man, were probative of his motive, and indeed do not warrant reversal under our plain error analysis.

[FN 2] The plain error standard of review is appropriate because Bai's counsel stipulated to admission of the photographs.

*See Mclellan v. State,* 124 Nev. 263, 267, 182 P.3d 106, 109 (2008) ("We [generally] review a district court's decision to admit or exclude evidence for an abuse of discretion. However, failure to object precludes appellate review of the

matter unless it rises to the level of plain error." (internal footnote and quotation omitted)).

Moreover, given the witness testimony as to the events leading up to and including the morning of July 6, 2009, we are persuaded that, had the district court excluded evidence of gang affiliation or that Bai was a hit man, the result would be the same. *See Rhymes v. State,* 121 Nev. 17, 22, 107 P.3d 1278, 1281 (2005) (concluding no reversible error exists where the result would have been the same if the trial court had not admitted the evidence). The same would be true of the result had the district court conducted a *Petrocelli* hearing before admitting the evidence. *Qualls v. State,* 114 Nev. 900, 904, 961 P.2d 765, 767 (1998) ("[T]he trial court's failure to conduct a *Petrocelli* hearing prior to admitting this evidence amounted to harmless error."); *see also Petrocelli v. State,* 101 Nev. 46, 51, 692 P.2d 503, 507 (1985), *superseded in part by statute as stated in Thomas v. State,* 120 Nev. 37, 45, 83 P.3d 818, 823 (2004) (approving the procedure followed by the district court prior to allowing questions pertaining to a collateral offense). Thus, we conclude reversal is also unwarranted on these grounds.

(ECF No. 14-6 at 6–8.)

The Supreme Court of Nevada could reasonably conclude the admission of evidence supporting the State's theory that Bai's motive for killing Li was his relationship as a hitman for the United Bamboo gang did not render the trial fundamentally unfair and was not of such a quality as necessarily prevented a fair trial in violation of federal due process. *Richter*, 562 U.S. at 102. The jury could draw reasonable inferences that Bai killed Li as a hitman for the United Bamboo gang from evidence that (1) Bai told police in November of 2008 that he was a United Bamboo gang member; (2) Bai's "close" relationship and interactions with Brother Three; (3) Brother Three's role as the shot-caller for United Bamboo and the gang's business practices; (4) Wang's testimony that Li told her he did not owe Bai, but had offended Brother Three; (5) Bai's actions in beating Li and threatening physical harm if Li did not pay Bai $10,000; (6) Bai's attempts to locate Li after Li failed to pay; and (7) Bai's prompt and violent killing of Li upon locating him.

Even assuming admission of the gang-affiliation evidence was erroneous under clearly established Federal law as determined by the Supreme Court, the determination that, absent the evidence "the result would be the same," is objectively reasonable. *Ayala*, 576 U.S. at 269–70. In the absence of the gang-and hitman-related evidence, the evidence supports rational inferences that Bai killed Li with the mental state required for first-degree murder. *See also supra*, n.2. Pei and Wang each testified Bai demanded $10,000 from Li, beat Li, and threatened him with additional physical harm at the 99 Ranch Market in May of 2009. Bai and Pei drove Li to a bank

to acquire the funds, but the bank was closed. When Li failed to pay as promised, Bai searched for Li and enlisted others to locate Li. When Bai found Li in July of 2009, Bai, armed himself, and entered the nightclub where he was told Li was located. Bai ignored Guo's attempts to calm down and stabbed Guo in an attempt to stab Li. Bai then chased and stabbed Li multiple times to Li's death, and stabbed Yao, who attempted to stop Bai from continuing to harm Li. Bai then fled in Pei's vehicle and on a bus to California until he was apprehended by police. The Supreme Court of Nevada's determinations are neither contrary to nor constitute unreasonable applications of Federal law, as clearly established by the Supreme Court, and are not based on unreasonable determinations of the facts in light of the evidence presented in the state-court proceeding. Bai is not entitled to federal habeas corpus relief for Ground 2(A). The Court will issue a certificate of appealability as Bai demonstrates the denial of a constitutional right and reasonable jurists could debate whether the Court is correct in its assessment of the reasonableness of the state court's determinations. *Slack*, 529 U.S. at 473.

### 3.   Ground 2(B)—Photographs of Bai and Weapons

Bai claims photographs depicting him "dressed in black with a gun posing as a title character of the video game 'Hitman,'" and with weapons, were irrelevant, more prejudicial than probative, and violated his due process rights because such evidence proved only a propensity for criminality or bad character. (ECF No. 24 at 19.)

The defense moved to preclude admission of photographs depicting Bai "in black posing as a warrior/hitman" as irrelevant, and a photograph that spelled "hitman" with weapons, as prejudicial evidence of propensity for criminality. The State argued the photographs were dated a few months before Li's murder, the State had evidence Bai is "a hitman," and the photographs are probative of "premeditation," "deliberation," and "intent." The defense argued "[t]he State has no evidence to prove that anyone ordered a hit." The State and the defense nonetheless agreed the State could use two of the photographs in opening remarks for the guilt phase of the trial, subject to argument about admissibility during trial. (ECF Nos. 25-8 at 4; 40-2 at 15–17; 40-6 at 73.)

In opening remarks, the State argued Bai "likes to take pictures of himself playing with" weapons and noted the jury "saw the picture of the hitman . . . ." Las Vegas Metropolitan Police

Department ("Metro") homicide detective Joel Kinser testified police found the photographs on Pei's camera, and the parties stipulated to admission of certain photographs found on the camera:

> [THE STATE]: [Defense counsel] and I discussed it and the agreement we've reached is to put in a thumbnail of the items that are on the phone . . . it's like a four or five piece of paper . . . marked the next State's in order which is—
>
> THE CLERK: 240.
>
> [THE STATE]: —which is a thumbnail of the items that are on the phone, as well as the two pictures that we want in and that resolves the situation. We won't be offering . . . the individual videos of what's going on, on the phone.
>
> THE COURT: Is that correct, [defense counsel]?
>
> [DEFENSE COUNSEL]: Yes, except for the issue of the videos that have previously been decided, but instead of getting to the box of photos that we have, we're willing to both stipulate to just to present them with this thumbnail, four page long—as [the State] represented.

(ECF Nos. 41-2 at 40; 42-2 at 41–50, 53–54.)

The Supreme Court of Nevada's determination on direct appeal that the defense stipulated to admission of the photographs is supported by the record. For the reasons stated in Ground 2(A), the state supreme court could reasonably conclude admission of the photographs was not fundamentally unfair in violation of federal due process and was not of such a quality as to deny Bai a fair trial. Given the State's theory of the case and other evidence of Bai's gang-affiliation, the jury could draw reasonable inferences about Bai's motive for killing Li from photographs of Bai dressed as a hitman and photographs of his weapons. *Richter*, 562 U.S. at 102. And, for the reasons stated in Ground 2(A), even if admission of the photographs was error, the state supreme court reasonably concluded the admission of the photographs did not change the outcome. The Supreme Court of Nevada's determinations are neither contrary to nor constitute an unreasonable application of clearly established Federal law, as determined by the Supreme Court, and are not based on unreasonable determinations of the facts in light of the evidence presented in the state-court proceeding. Bai is therefore not entitled to federal habeas corpus relief for Ground 2(B). The Court will issue a certificate of appealability as Bai has demonstrated the denial of a constitutional right and reasonable jurists could debate whether the Court is correct in its assessment of the reasonableness of the state court's determinations. *Slack*, 529 U.S. at 484.

#### 4.     Ground 2(C)—Juror Question about Asian Gang Practices

Bai contends the trial court violated due process by improperly asking Detective Yu the juror-inspired question, "With your knowledge of gangs and their leaders, is it common with the Asian gangs to hold family members captive until the other family members complete an illegal act?" Bai contends the question was irrelevant and prejudicial because Wang is not related to Li and the question shows the jury was distracted by gang-affiliation. (ECF No. 24 at 19–20.)

In Nevada, trial courts have discretion to allow juror-inspired questions in a criminal case; however, to minimize the risk of prejudice, a trial court must carefully control the process by employing seven procedural safeguards: (1) giving initial jury instructions explaining that questions must be factual in nature and designed to clarify information already presented; (2) requiring that jurors submit questions in writing; (3) determining admissibility of questions outside the presence of the jury; (4) giving counsel the opportunity to object to each question outside the presence of the jury; (5) instructing the jury that only questions permissible under the rules of evidence will be asked; (6) allowing counsel to ask follow-up questions; and (7) instructing jurors they must not place undue weight on the responses to their questions. *Flores v. State*, 114 Nev. 910, 913, 965 P.2d 901, 902–03 (1998), *as amended* (Feb. 4, 1999). Failure to comply with these prerequisites is subject to harmless error analysis for non-constitutional error. *Knipes v. State*, 124 Nev. 927, 935–37, 192 P.3d 1178, 1183–84 (2008) (holding failure to fully comply with procedural safeguards for juror questioning of witnesses set forth in *Flores* generally will amount to non-constitutional error subject to harmless review based on "whether it had substantial and injurious effect or influence in determining the jury's verdict.") (citing *Kotteakos,* 328 U.S. at 776.)

Before opening remarks, the trial court instructed the jurors concerning the parameters of their ability to ask questions of witnesses in compliance with the requisite procedural safeguards required by *Flores*. (ECF No. 41-2 at 20–21.) The jury heard Wang testify that Li was her daughter's father, and heard Pei testify that Li identified Wang as his wife during the incident at 99 Ranch Market and Bank of America. *See supra*, at p. 3. The trial court entertained written questions from the jury, permitted counsel to interpose objections, and posed a juror's question to Detective Yu: "With your knowledge of gangs and their leaders, is it common with the Asian

gangs to hold family members captive until the other family members complete an illegal act? Make them do what they want?" The trial court overruled Bai's objection that the question was irrelevant on the grounds the kidnapping charge did not involve family members, and the question was posed to Detective Yu, who replied, "I want to be careful when I use the word common. I've seen kidnappings. I've seen a kidnapping for ransoms [sic], but each case is very specific. There is a motive. There's a subject of intent in every case and every case is different. So does it happen every day? No. Does it happen? Yes." Counsel was permitted to, but did not, conduct follow up questions. (ECF Nos. 41-2 at 70; 42-1 at 19–94).

On direct appeal, the Supreme Court of Nevada concluded that posing the juror's question to Detective Yu was not an abuse of discretion and Yu's response helped reduce any prejudice:

*Juror question*

Bai contends that he was prejudiced when the court asked a juror question of Detective Yu regarding whether it is common within Asian gangs to hold family members captive. Bai's counsel objected to this question as irrelevant. However, we conclude that the district court was within its discretion to ask this juror question after taking certain procedural safeguards to minimize any prejudice. *See Flores v. State,* 114 Nev. 910, 913, 965 P.2d 901, 902 (1998) ("[A]llowing juror-inspired questions in a criminal case is not prejudicial per se, but is a matter committed to the sound discretion of the trial court. To minimize the risk of prejudice, however, the practice must be carefully controlled by the court. Accordingly, inclusion of juror questions must incorporate certain procedural safeguards to minimize the attendant risks.") (internal citation omitted). Moreover, Detective Yu's answer that kidnapping is not an everyday occurrence and is case specific, helped quell any prejudice arising from the question.

(ECF No. 14-6 at 13–14.)

The Supreme Court of Nevada could reasonably determine the juror-inspired question and Yu's response did not result in a fundamentally unfair trial and was not of such a quality as necessarily prevented a fair trial in violation of federal due process. *Richter*, 562 U.S. at 102. The jury could rationally infer from Wang and Pei's testimony that Li and Wang had a familial relationship, or that Bai perceived so during the kidnapping and extortion at the 99 Ranch Market and Bank of America. As the State's theory was that Bai was acting on behalf of an Asian gang, the question was relevant because it inquired whether Bai's actions were consistent with the actions of Asian gangs. Therefore, the juror's question and Yu's response did not render the trial fundamentally unfair and were not of such a quality as necessarily prevents a fair trial. Even if

erroneous, the Supreme Court of Nevada could reasonably conclude the question and response did not have a substantial and injurious effect or influence on the determination of guilt. As the state supreme court noted, Yu's response diminished the significance of any connection between Bai's actions in kidnapping Li at the market and Asian gang activity. The Supreme Court of Nevada's determinations are neither contrary to nor constitute unreasonable applications of clearly established Federal law, as determined by the Supreme Court, and are not based on unreasonable determinations of the facts in light of the evidence presented in the state-court proceeding. Bai is not entitled to federal habeas relief for Ground 2(C).

### 5.   Ground 2(D)—Bai's Letter to his Mother

Bai claims the trial court violated due process by admitting into evidence a letter Bai wrote to his mother, on the grounds it was irrelevant, and its probative value was substantially outweighed by the prejudicial effect. Bai claims the letter contains no indicia of consciousness of guilt and Pei's translation of the letter during her testimony "did not possess significant guarantees of fairness and trustworthiness to ensure a fair trial." (ECF No. 24 at 21–24.)

Detective Kinser testified he impounded a letter addressed to Bai's mother, Ying Chen. The letter was translated by two certified court interpreters; however the State intended to have Pei read her translation of the letter during trial. The defense had no objection to the foundation for the letter, but objected to its admission on the grounds it was irrelevant, more prejudicial than probative, and the interpreters differed in their interpretations of certain words, including "brother." The defense also contested Pei's translating the letter, insisting the trial court have "the two interpreters who interpreted the letter" employ a check system explaining where their translations differed from one another. The State argued Pei could testify Bai wrote the letter and that the letter's contents are "directly related to the facts in controversy in this particular case, specifically his knowledge of [Li]," and "his prior relationship with people involved with [Li] . . . ." The State furthermore argued the letter is evidence of consciousness of guilt because Bai made efforts in the letter to have it conveyed to Brother Lei "what it is that should be said and not said during this trial." Defense counsel pointed out Brother Lei is not a trial witness, and argued that, although there is a "reference to Brother Three," "there's nothing in this letter that proves anything

about Brother Three." The trial court ruled Pei could translate the letter into English and read it to the jury; the court interpreters could "chime in" with any disagreements about Pei's translations; and the parties could cross-examine Pei and the interpreters about their translations. (ECF Nos. 42-2 at 62–70; 43-3 at 6–8, 14, 23–28.)

Pei testified Bai's handwriting was on the envelope and the letter was addressed to Bai's mother. The defense had "no objection" to admission of the letter. When the State asked Pei to "read as best as you can the information based upon your relationship with Mr. Bai that he's trying to convey in this letter," the defense objected that the request "calls for speculation" and for Pei to inappropriately translate the letter. The State argued "she can understand what it is he's attempting to convey in the letter." The defense objected the letter is not addressed to Pei, and the State was asking Pei to "superimpose the relationship that she has had with Mr. Bai in interpreting it." The trial court held, "Ms. Pei can describe for us the manner in which Mr. Bai writes his meaning but it's open for cross-examination . . . ." Pei translated portions of the letter, alongside the interpreter's translations:

> Today is Thursday, November 8th. I just called you tonight and then the investigator came to see me. He find [sic] a guy name (indiscernible) from the information provide [sic] by Brother Three. I call him Brother Lay. Before I was in LA—. He's kind [sic] like [a social man, a man in the society].[8] And he was the victim's bodyguard before and solved some problem for the victim. When I came to Las Vegas . . .[9] I live for a few days at the house rented by the victim for Brother Lay. And then me [sic] and Lao Sho To (phonetic) rent another two-bedroom house, and then me [sic] and Pei Pei change to another place to live and then know [sic] the—like the couple.[10] I want to say if you have—if there is a chance, tell Brother Three where (indiscernible) tell Brother Lay don't say I have live [sic] with the victim or Brother Lay. Because the investigator . . .[11] Because the investigator tried

---

[8] Pei said she did "not know how to" interpret the rest of that sentence. The court interpreter said, "I would say just a social man, a man in the society." Pei replied, "Yeah," and continued reading the letter. (ECF No. 43-3 at 99–100.)

[9] The prosecutor told Pei, "I'm going to translate what the translator has written here and ask you if generally that information is correct, okay?" The prosecutor next read the sentence: "When I came to Las Vegas, and then he says something else and then it says, I live for a few days at the house rented by the victim for Brother Lay," and asked Pei, "Is that generally correct?" Pei answered, "Yes." (*Id.*)

[10] Pei said, "that [couple] means Sophia and Jacky" and Lao Sho To "knows Brother Three." (*Id.*)

[11] The interpreter's translation: "[d]on't ever said that I have lived at the victim or Brother Lay's place."

The trial court explained that it misunderstood the reason for Pei's translation. The trial court believed the

1    to make the Court believe the reason that I know the victim is from my father, like
     my father was like some kind of victim, like a—[12] And then later the victim
2    harassing my girlfriend. After this I never contact [sic] the victim.[13]

3    (ECF No. 43-3 at 93–120.) The court's interpreter translated the remainder of the letter:

4          Before this I have never contacted the dead, nor did I have any issues with
     him. This will rule out support the [sic] argument against the DA's theory of murder
5    with intention and plant. I told the detective[14] that I know Lei Gu Siu San Gu
     (phonetic) [Brother Lei] [Brother Three],[15] as far as the cooperation between him
6    and the dead or what they did, I have not much [sic] idea. When I came to LV, I
     rented a two bedrooms [sic], one living room house. At the time, Lei Gu [Brother
7    Lei] has come [sic] over from time to time and played Mahjong with us. I have
     went [sic] over to his place to play, but don't know whose house it is. I never spent
8    the night there either. Detective told me Leizee[16] was kind of stressed out being the
     witness, but Shao Han (phonetic),[17] if you have any way, please tell Lei Gu [Brother
9    Lei] for me that don't be afraid, detective is on my side, but he cannot speak
     explicitly to teach Lei Gu [Brother Lei] how to say. Lei Gu [Brother Lei] just needs
10   to prove that the dead has conned a lot of people and always used money to hire
     gang men to take care of the opponents and to harm the people who wanted to
11   avenge him. And cops, bodyguard or security to protect himself. After Lei Gui
     [Brother Lei] found out later that there were more and more people got conned and
12   offended by the dead, and try to stop and tempt the people who wanted to kill the
     dead with money, Lei Gu [Brother Lei] broke the cooperative relationship and
13   stopped communication. In all, don't say that I have been at the dead or Lei Gu
     [Brother Lei]. If testify, know to say what is in my favor. And make sure the
14   testimony stays the same all the time. Shao Han, if this Lei Gu [Brother Lei] can
     come to testify, his testimony is extremely important to me with great impact. So
15   must to [sic] contact him through San Gu (phonetic) [Brother Three] and let him
     understand that don't fear, don't worry and how to describe the dead was awfully
16   dangerous and hateful.

17   (ECF No. 43-34 at 121–27.) The original letter was admitted into evidence after defense counsel

18   stated, "just outside of what was previously addressed, we don't have an objection." (*Id.*)

19        The Supreme Court of Nevada determined the defense did not object to admission of the

20   letter, the letter was admissible as more probative than prejudicial as it demonstrated consciousness

21
     _____
22   letter is written in a hybrid between Chinese and Mandarin, but the court interpreter clarified the letter is written with
     traditional Chinese characters which have nothing to do with spoken dialects. (*Id.* at 101–116, 120.)

23       [12] The interpreter translation: "The reason why I know the dead was because father was conned." (*Id.*)

24       [13] The interpreter's translation: "Before this I have never contact [sic] the dead." (*Id.* at 120–21.)

25       [14] The interpreter translated "detective" as a private investigator rather than policeman. (*Id.* at 122.)

26       [15] Pei testified the reference to "Lei Gu" is to Brother Lei and "San Gu" is to Brother Three. (*Id.*)

27       [16] The interpreter said the character for "Leizee" is the same as for "Lei Gu." (*Id.* at 123–24.)

28       [17] The interpreter said the characters for "Shao Han" are the same as for the addressee of Bai's letter. (*Id.*)

of guilt, and the interpreters clarified translation differences, subject to counsel's cross-examination:

> *Letter from Bai to his mother*
>
> Bai asserts that the district court abused its discretion by allowing a letter Bai wrote to his mother to be admitted and translated by Pei. However, Bai did not object when the State moved to admit the letter. Under plain error review, we conclude that the district court did not abuse its discretion by allowing Bai's letter to his mother, written in Chinese while he was incarcerated, to be admitted. The letter was more probative than prejudicial, see NRS 48.035(1), and demonstrated consciousness of guilt. *See Abram v. State*, 95 Nev. 352, 356, 594 P.2d 1143, 1145 (1979) ("Declarations made after the commission of the crime which indicate consciousness of guilt, or are inconsistent with innocence, or tend to establish intent may be admissible."). Additionally, although Bai's counsel objected to Pei translating portions of the letter in general, and objected after each translation with which he disagreed, Pei was not acting as a court interpreter, and thus was not required to meet the court interpreter qualifications under NRS 50.054.6.
>
> [FN 6] Court interpreters had also made available a written translation prior to Pei's testimony.
>
> Moreover, the court interpreters clarified the minimal translation inconsistencies that arose during Pei's testimony, and Bai's counsel had an opportunity to address any misinterpretations during cross-examination. Therefore, we are persuaded that the district court did not abuse its discretion by admitting the letter and allowing Pei to translate parts thereof.

(ECF No. 14-6 at 15.)

The state court record supports the Supreme Court of Nevada's determination that the defense did not object when the State moved to admit the letter into evidence. The defense objections were directed to Pei's translation of the letter. When the State moved to admit the letter, including the court interpreter's translation attached to it, the defense clearly stated, "Just outside of what was previously addressed, we don't have an objection to it." (ECF No. 43-3 at 127.) It was objectively reasonable for the state supreme court to conclude inferences of consciousness of guilt could be drawn from the letter as the contents suggest Bai requested his mother contact potential witnesses, persuade them to testify in a certain way, and tell the witnesses to avoid testimony disadvantageous to Bai. The record also shows Pei's partial translation of the letter, alongside translations by the court interpreter, were admitted with accommodations to counsel to cross-examine Pei and the court interpreters concerning their respective translations. Under the circumstances, the Supreme Court of Nevada could reasonably conclude admission of the letter

and Pei's partial translations did not render the trial fundamentally unfair and were not of such a quality as necessarily prevented a fair trial in violation of federal due process. *Richter*, 562 U.S. at 102. The Supreme Court of Nevada's determination is neither contrary to, nor constitutes an unreasonable application of Federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. Thus, Bai is not entitled to federal habeas corpus relief for Ground 2(D).

## C.   Ground 3—Prosecutorial Misconduct

Bai alleges the prosecutor committed misconduct in violation of the Sixth and Fourteenth Amendment by (A) eliciting testimony from Detective Yu that Guo and Yao were afraid to identify Bai; (B) eliciting Yu's testimony about Asian gang culture; (C) shifting the burden of proof to Bai in closing arguments during the guilt phase; (D) interjecting personal beliefs about Bai's guilt during the penalty phase; and (E) speaking with Guo about his testimony off the record in the hallway during a break in Guo's examination. Respondents contend there is no basis to conclude the prosecutor committed misconduct. (ECF Nos. 24 at 24–33; 79 at 34–45; 82 at 19–34.)

### 1.   Governing Principles

The standards set forth in *Darden v. Wainwright*, 477 U.S. 168 (1986), is the "clearly established law" governing claims of prosecutorial misconduct for purposes of habeas review under AEDPA. *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (holding state court's rejection of claim that prosecutor committed misconduct by stating that several witnesses feared the defendant was not an unreasonable application of *Darden* because the prosecutor's statements were reasonably drawn from the witness testimony). "It is not enough that the prosecutor's remarks were undesirable or even universally condemned; rather, the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotation marks omitted) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) (determining whether "remarks, in the context of the entire trial, were sufficiently prejudicial to violate respondent's due process rights")); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

The standard is general, leaving courts "more leeway . . . in reaching outcomes in case-by-case determinations . . ." *Matthews*, 567 U.S. at 48 (quoting *Alvarado*, 541 U.S. at 664). Claims of prosecutorial misconduct are reviewed "on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Sublett*, 63 F.3d at 929 (citation and internal quotation marks omitted); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Turner v. Calderon*, 281 F.3d 851, 868 (9th Cir. 2002) (examining "the likely effect of the [prosecutor's] statements in the context in which they were made").

To warrant federal habeas relief, a state court's rejection of a prosecutorial misconduct claim must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Matthews,* 567 U.S. at 47 (quoting *Richter,* 562 U.S. at 103). If so, then "prosecutorial misconduct warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Davenport*, 142 S. Ct. at 1517 ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA.").

### 2.    Ground 3(A)—Yu's Testimony that Guo and Yao Were Afraid

Bai contends the prosecutor elicited improper character evidence from Detective Yu that stabbing victims Guo and Yao feared identifying Bai as the perpetrator of their injuries due to their fear of gangs. Bai claims the testimony unduly influenced the jury to convict Bai based on a belief he is a "bad person." Respondents contend the prosecutor did not elicit testimony Guo or Yao feared Bai or feared retaliation from Bai and did not elicit testimony Bai directly intimidated either witness. (ECF Nos. 24 at 24–26; 79 at 35–36; 82 at 20–22.)

Guo testified Li was sometimes accompanied by an armed policeman who acted as Li's bodyguard. When a juror asked Guo if he was afraid, Guo replied, "a little bit," but identified Bai as his assailant. Yao neither testified about gangs nor that her failure to initially identify Bai was out of fear. She testified Detective Yu showed to her a photographic line-up array and she thought one photograph "looks like" Pei's boyfriend, but she was only 50% certain the photograph depicted

Pei's boyfriend because she only saw him once in a photograph Pei showed to her and another time when he picked up Pei, during which Yao "didn't really pay attention to his face." Yao was unaware Li was associated with organized crime. (ECF Nos. 37-1 at 30–37; 42-4 at 32, 80–81.)

Detective Yu testified Guo "appeared" "extremely nervous and scared" at their first interview. Yu explained, "[t]he Asian community or Chinese community do not trust law enforcement," and there is a strong language barrier. Yu agreed that, having been a victim of a violent crime and having fled the scene, may have caused Guo trepidation, along with Guo having "made references to him being in Vegas" and "someone's going to come after him." The defense objected that Yu was "getting into bad character evidence" and "trying to impute" Bai is "violent" and "dangerous." The State argued Guo's generalized fears about gang members was admissible as long as it was not specifically tied to Bai and did not accuse Bai "of being involved or his friends are involved or anything, but just the culture of people and their fear . . . of gang members . . . ." The trial court sustained the objection and instructed the jury to disregard Yu's testimony that Guo expressed fear of retaliation. However, with the consent of the defense, the trial court permitted Yu to testify Guo expressed a "general fear of gangs." (ECF No. 42-1 at 122–34.)

Detective Yu testified he asked Yao whether she could identify Bai in a photographic lineup, and that Yao placed her finger on Bai's photograph, but told Yu she was unsure, and Yao wrote, "not sure, can't pick." Yu said Yao telephoned him minutes after he left Yao's home and told him she could identify the perpetrator [as Bai] but was "scared." Defense counsel objected and moved for mistrial arguing Yu's testimony "about how scared everybody is to identify" Bai or testify, was irrelevant and prejudicial character evidence given Bai's concession that he was the stabber. The trial court overruled the objection. (*Id.* at 137–41.)

In his direct appeal in state court, Bai claimed the prosecutor committed misconduct and the trial court erred in allowing Yu's testimony that Guo and Yao feared Bai. (ECF No. 43-3 at 46–48.) The Supreme Court of Nevada concluded the trial court did not err: "Bai also argues that the district court erred by allowing the State to elicit testimony suggesting that he intimidated witnesses. As in *Lay,* we conclude that no testimony was elicited that suggested the witnesses were directly intimidated by Bai. 110 Nev. at 1193–94, 886 P.2d at 450–51." (ECF No. 14-6 at 14.)

Bai's prosecutorial misconduct claim alleged in Ground 3(A) was intertwined with a related claim that the trial court erred in permitting the State to present Yu's testimony that Guo and Yao feared Bai. *See Scott v. Schriro,* 567 F.3d 573, 583 (9th Cir. 2009) ("All exhaustion requires is that the state courts have the opportunity to remedy an error, not that they actually took advantage of the opportunity.") (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971)). Thus, this Court reviews the prosecutorial misconduct claim with AEDPA deference. *See supra,* at pp. 8–9.

The state supreme court could reasonably reject the claim that the prosecutor committed misconduct by eliciting Yu's testimony about fear expressed by Guo and Yao, on the basis that it did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. *Richter*, 562 U.S. at 102. The jury was instructed to disregard Yu's testimony that Guo told Yu he was afraid that "someone was going to come after" him and "[a] jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Moreover, the defense agreed the State could ask Yu whether Guo expressed a generalized fear of gangs. Yu also testified Yao told him she initially did not identify Bai because she was "scared," but neither Yao nor Yu testified about the source of Yao's fear. Yao did not testify about gangs, a belief that Bai was dangerous, or that she was afraid of Bai. There was no basis for the jury to conclude Yao's fear of identifying Bai was related to a fear of gangs or belief that Bai was dangerous. The Supreme Court of Nevada's determination is neither contrary to, nor constitutes an unreasonable application of clearly established Federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. Bai is not entitled to federal habeas relief for Ground 3(A).

### 3.  Ground 3(B)—Testimony about Gang-Affiliation and Asian Gangs

Bai claims the prosecutor committed misconduct by eliciting Detective Yu's testimony about Bai's membership in the United Bamboo gang. He claims Yu's testimony was irrelevant because the State produced no evidence that Brother Three ordered Bai to kill Li or that Bai knew Li offended Brother Three, and the testimony about gangs improperly and purposefully inflamed the passion of the jury by putting "gangs on trial." Respondents contend the record does not support any finding of prosecutorial misconduct. (ECF Nos. 24 at 26–29; 79 at 36–37; 82 at 22–23.)

Detective Yu testified that, in the Asian culture, individuals refer to older individuals whom they know as "big brother," but in the Asian gang subculture, "big brother" means "the big homey, the shot caller, the head honcho, the big guy, the number one person" who is given respect in the hierarchy and that respect is "earned by the Big Brother's reputation." Yu said older gang members expect respect, expect to be called "Big Brother," and there are otherwise consequences including "exile from the gang, being physically assaulted, or paying dues." The defense objected that Yu's testimony about gang culture was irrelevant. The State argued it was the State's theory, as Wang testified, that Li was killed because Brother Three was offended. The objection was overruled. Yu testified leaders of gangs are also expected to react to disrespect, usually with violence, and the more violent, the better. Yu testified someone like Li would be expected to pay dues or "taxes" to Brother Three and not paying would be an "ultimate disrespect." (ECF No. 42-1 at 149–56.)

In his opening brief in his state court direct appeal, Bai claimed, the prosecutor committed misconduct by presenting Yu's testimony because it was designed to "inflame the passions of the jury" and the state district court abused its discretion in overruling the defense's repeated objections. (ECF No. 47-31 at 49–53.) The Supreme Court of Nevada expressly concluded the trial court did not err in permitting the State to elicit "evidence of Bai's relationship to United Bamboo and alleged status as a hit man for United Bamboo" because it "was probative of Bai's motive for killing Li, such that any prejudice was outweighed." *See supra*, at pp. 22–23. Because in the state court proceeding, Bai's prosecutorial misconduct claim in Ground 3(B) was intertwined with a related claim that the trial court erred in permitting gang-related evidence, this Court reviews the prosecutorial misconduct claim with AEDPA deference. *See supra*, at pp. 8–9.

The Supreme Court of Nevada could reasonably reject the claim that the prosecutor committed misconduct by eliciting Yu's gang-related testimony, on the basis that it did not so infect the trial with unfairness as to result in a denial of due process. *Richter*, 562 U.S. at 102. The record shows the prosecutor did not present Yu's testimony about gangs in a vacuum; rather, as the state supreme court explained, Yu's testimony supported the State's theory that Bai was motivated to commit the crimes in his role as a hitman for the United Bamboo gang. *See* Ground 2(A). Bai personally confirmed his membership in the United Bamboo gang to police in 2008.

Photographs found in Pei's camera after Li's murder in 2009 depicted Bai dressed as a "hitman" and the word "hitman" spelled with weaponry. Pei testified Brother Three was a member of the United Bamboo gang, and Bai and Brother Three were "very close." Wang testified Li told her he did not owe money to Bai; rather, Li had offended Brother Three. Pei and Wang testified Bai physically beat Li at the 99 Ranch Market and Pei heard Bai threaten to break Li's legs if he did not pay $10,000; however, Bai did not disclose to Pei details about Li's debt. Pei testified Bai always carried a knife and enlisted help to locate Li when Li failed to pay Bai. When Li did not pay as promised, Bai killed him as soon as he located him. It is true that the State failed to provide direct evidence that Brother Three instructed Bai to kill Li, or that Bai knew Li offended Brother Three. However, Detective Yu's testimony, in the context of the other evidence, provided a link that permitted the jury to draw rational inferences that Bai's attempts to collect the money, intentional search for Li, and immediate and vicious killing of Li soon after Bai entered Forbes KTV, were motivated to avenge the gang, or its leader. Accordingly, the Supreme Court of Nevada's determinations are neither contrary to nor constitute an unreasonable application of clearly established Federal law, as determined by the Supreme Court, and are not based on unreasonable determinations of the facts in light of the evidence presented in the state-court proceeding. Bai is not entitled to federal habeas relief for Ground 3(B).

### 4. Grounds 3(C) and (D)—Prosecutor's Rebuttal Arguments to the Jury

Bai alleges certain remarks of the prosecutor during rebuttal arguments in the guilt and penalty phases constitute prosecutorial misconduct.

### a. Governing Principles

In determining whether a prosecutor's argument rendered a trial fundamentally unfair, a court must judge the remarks in the context of the entire proceeding to determine whether the argument influenced the jury's decision. *Boyde v. California,* 494 U.S. 370, 385 (1990) (citations omitted); *see also Phillips*, 455 U.S. at 219 ("The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). "[A] prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due

process.'" *Matthews*, 567 U.S. at 45 (quoting *Darden*, 477 U.S. at 181). *Darden* explained "it is not enough that the prosecutor's remarks were undesirable or even universally condemned." 477 U.S. at 180–81 (quoting *DeChristoforo*, 416 U.S. at 643). Factors to consider when determining whether a prosecutor's comment rendered a trial constitutionally unfair, include: (1) whether the comment misstated or manipulated the evidence; (2) whether the judge admonished the jury to disregard the comment; (3) whether defense counsel invited the comment; (4) whether defense counsel had an adequate opportunity to rebut the comment; (5) the prominence of the comment in the context of the entire trial; and (6) the weight of the evidence. *Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th Cir. 2010) (citing *Darden*, 477 U.S. at 182). The ultimate question is whether the alleged misconduct rendered the petitioner's trial fundamentally unfair. *Darden*, 477 U.S. at 183.

Prosecutors have "wide latitude" in closing arguments to argue inferences that are reasonably drawn from the evidence. *See United States v. Wilkes*, 662 F.3d 524, 538 (9th Cir. 2011); *see e.g.*, *Ayala v. Chappell*, 829 F.3d 1081, 1115 (9th Cir. 2016) (holding prosecutor's statements that witnesses feared defendant were reasonably drawn from testimony). However, a prosecutor may not "on his own initiative" ask a jury to draw an adverse inference from a defendant's silence. *United States v. Robinson*, 485 U.S. 25, 32 (1988) (clarifying the holding in *Griffin v. California*, 380 U.S. 609, 615 (1965) and holding there is no misconduct where a prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel). A prosecutor's references in closing remarks to State's evidence as "unrefuted" and "uncontradicted" does not constitute comment on defendant's failure to testify where defense counsel focused the jury's attention on defendant's silence. *Lockett v. Ohio*, 438 U.S. 586, 595 (1978); *see also Cook v. Schriro*, 538 F.3d 1000, 1020 (9th Cir. 2008) (stating, "[p]rosecutors may comment on the failure of the defense to produce evidence to support an affirmative defense so long as it does not directly comment on the defendant's failure to testify."). Prosecutors may not give personal opinions about the evidence as it "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *See United States v. Young*, 470 U.S. 1, 18–19 (1985) (citing *Berger v. United States*, 295 U.S. 78, 88–89 (1935) (finding prejudicial misconduct where prosecutor

misstated the facts in cross-examining witnesses; put into the mouths of witnesses things they had not said; suggested by his questions that statements were made to him personally out of court, in respect of which no proof was offered; pretended to understand a witness said something which he had not said, and persistently cross-examined the witness on that basis; assumed prejudicial facts not in evidence; bullied and argued with witnesses; and, in general, conducted himself in a "thoroughly indecorous and improper manner.").

## b.   Ground 3(C)—Rebuttal Arguments During the Guilt Phase

Bai claims the prosecutor made three rebuttal arguments during the guilt phase of the trial that improperly shifted the burden to Bai to prove he was not affiliated with a gang:

(1) [Bai is] a confirmed [gang] member who isn't really disput[ing] that he beat James in May of 2009 and spent the next two months looking for him;

(2) Mr. Bai is almost undisputed told [sic] James Li I will break your legs if you didn't pay the money and we all agree he didn't pay the money; and

(3) And we don't need anything other than his letter to establish that his lie about the motive, that he's lying about the motive, and if he's lying about the motive there is only one fact that must be true, he is a hit man for the Asian mafia and he deserves to be convicted of each and every count.

Respondents claim the arguments are not misconduct. (ECF Nos. 24 at 29–30; 79 at 38–39.)[18]

Before closing remarks during the guilt phase of the trial, the trial court instructed the jury (1) not to draw any inferences from Bai's exercise of his right not to testify; (2) Bai was "presumed innocent until the contrary is proved"; and (3) this "presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged, and the defendant is the person who committed the offense." The trial court further instructed that "arguments and opinions of counsel are not evidence in the case." (ECF No. 44-3 at 15, 30.)

In closing remarks during the guilt phase, defense counsel argued, "The State must meet a threshold in order for you to consider first degree murder, and they have been unable to show any live credible evidence that there was a felonious intent at that instant." Counsel argued "[n]o one has testified that this young man went into that building intending to kill." Counsel argued the

---

[18] Respondents contend Bai waived the claim because counsel did not object at trial. (ECF No. 79 at 38–39.) Bai's claim was addressed in his direct appeal. (ECF No. 47-31 at 55.)

State presented "nothing other than Detective Yu's speculations this had anything to do with collection of a debt on the part of Brother Three." Counsel argued that, by contrast, the jury "[h]eard live testimony yesterday concerning this family debt" and "[h]eard a living breathing witness testify concerning how Mr. Li defrauded this young man's father." Counsel argued, if this was "a cold calculated murder by a quote, unqote hit man," why didn't Bai wear a mask and kill Li in a crowded place with witnesses. (*Id.* at 60–65.) In rebuttal argument during the guilt phase of the trial, the prosecutor responded:

> We have a case in which a confirmed member of the United Bamboo kills somebody who is directly connected to the shot caller for the United Bamboo, a confirmed member of the United Bamboo who happens to have a paragraph [sic] of a hit man with a knife and brass knuckles, a confirmed member who isn't really disputed [sic] that he beat James in May of 2009 and spent the next two months looking for him, a guy who engages in a number of phone calls, is caught on video, and oh, by the way, has a paper plate on the back of his car and then goes into a bar full of people and knifes a guy 32 times and his lawyer says the State has a tough case. Really? Because none of that's really that disputed in this case.
>
> . . . .
>
> What [defense counsel] got up and did is [sic] read you the reasonable doubt instruction and told you hold the State to their burden. Please do. Hold me to my elements because it doesn't matter to me if James Li owes Faye Bai money in 2002 and somehow his son, who there's absolutely no evidence of, has knowledge that this James Li owed his father money and that's the reason why, after spending a month and a half looking for him, he walked into that bar and killed him or if it's the fact that that's his job, he just happens to be a hit man for the Asian mob. Those two facts are irrelevant in this particular case, totally and completely irrelevant. Either way he's guilty of first degree murder.
>
> . . . .
>
> Mr. Bai is almost undisputed [sic] told James Li I will break your legs if you didn't pay the money and we all agree he didn't pay the money. So when he says there's no evidence of what his intent was before, God knows there was because he spent the whole six weeks looking for him.
>
> . . . .
>
> We didn't roll Pei Pei to establish anything other than the identity of the perpetrator because that was [the] only fact in dispute two weeks ago. And we don't need anything other than his letter to establish that his lie about the motive, that he's lying about the motive, and if he's lying about the motive there is only one fact that must be true, he is a hit man for the Asian mafia and he deserves to be convicted of each and every count.

(*Id.* at 74–77, 80–81.)

The Supreme Court of Nevada determined the challenged comments were "vague" claims that the evidence is undisputed, and did not improperly reference Bai's failure to call witnesses:

*Prosecutorial misconduct*

Bai contends that the following three comments, made by the State during closing argument, constituted prosecutorial misconduct, as they improperly referenced his failure to call witnesses:

1) [A] confirmed member [of the United Bamboo] who [hasn't] really disputed that he beat [Li] in May of 2009 and spent the next two months looking for him.

2) [It] is almost undisputed [that Bai] told Li I will break your legs if you didn't pay the money and we all agree he didn't pay the money.

3) And we don't need anything other than his letter to establish that . . . he's lying about the motive, and if he's lying about the motive there is only one fact that must be true, he is a hit man for the Asian mafia and he deserves to be convicted of each and every count.

> [FN 3] Bai additionally contends that it is improper for counsel to characterize a witness as a liar. We have determined that calling the defendant a liar during closing argument is not reversible error when evidence of guilt is overwhelming. *See Skiba v. State,* 114 Nev. 612, 614–15, 959 P.2d 959, 960–61 (1998), *disapproved of on other grounds by Jackson v. State,* 128 Nev., Adv. Op. 55, 291 P.3d 1274, 1282 (2012). Here, the evidence of guilt is overwhelming because of scientific, video surveillance and eyewitness evidence supporting Bai's convictions.

> Our review is for plain error because the defense failed to object. *See Valdez v. State,* 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008) (determining that "[h]armless-error review applies . . . only if the defendant preserved the error for appellate review" and "[w]hen an error has not been preserved, this court employs plain-error review"). Prosecutorial misconduct is reviewed in two steps. *Id.* at 1188, 196 P.3d at 476. The first step is to determine whether the prosecutor's behavior was improper. *Id.* And if so, the second step is to determine whether it constitutes reversible error. *Id.*

> Although "[i]t is generally improper for a prosecutor to comment on a defendant's failure to call a witness," *Rippo v. State,* 113 Nev. 1239, 1253, 946 P.2d 1017, 1026 (1997), we conclude that the State's vague claims that the evidence was undisputed does not amount to such a reference. If there was no error, there was no plain error. *See Mclellan,* 124 Nev. at 267, 182 P.3d at 109 ("In conducting plain error review, we must examine whether there was error, whether the error was plain or clear, and whether the error affected the defendant's substantial rights." (internal quotations omitted)).

(ECF No. 14-6 at 5–11.)

The Supreme Court of Nevada's determinations are objectively reasonable. The prosecutor neither directly commented on Bai's failure to testify nor directly asserted Bai failed to present witnesses or evidence to refute the State's evidence. The trial court instructed the jury the State bore the burden of proving the charges beyond a reasonable doubt. The prosecutor asked the jury to hold the State to that burden. The trial court instructed the jury that Bai had the right to remain

silent and the jury must not infer guilt based on his failure to testify. Argument (1) that Bai was a member of the United Bamboo gang who beat James in May of 2009 and spent the next two months looking for him was based on the testimony of Pei, Wang, and Detective Yu. *See supra*, at pp. 2–6. Argument (2) that it was undisputed Bai told Li he would break his legs if he didn't pay him money, was a fair comment on Pei's uncontradicted testimony and did not shift the burden to Bai to disprove any element of the crimes. Argument (3) that Bai's letter contradicted his defense theory was based on the contents of the letter, which could reasonably be construed as entirely negating the defense theory that Bai was collecting money from Li that was fraudulently obtained from Bai's father, and instead, supported Bai's connection to Brother Three. Under these circumstances, it is objectively reasonable to conclude the prosecutor's comments did not so infect the jury with unfairness as to make the resulting conviction a denial of due process. Thus, the Supreme Court of Nevada's determination is neither contrary to nor constitutes an unreasonable application of clearly established Federal law, as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. Bai is not entitled to federal habeas relief for Ground 3(C).

### c.   Ground 3(D)(1)—Deferential Review of Penalty Phase Arguments (1), (2), and (4)[19]

Bai contends the prosecutor committed misconduct by improperly interjecting personal beliefs about Bai's guilt during the penalty phase of the trial with four rebuttal arguments:

(1) And you know, I took somewhat of an offense of it in guilt phase when [defense counsel] got up and said, hey, it's a tough case for the State, don't blame them but, hey, they just couldn't make it because it kind of—it was almost funny;

(2) The State's not the only people being manipulated. His own mother, the witnesses, these three guys, Dr. Wen, they're manipulated by their guy too;

(3) [C]onsidering how many people he's killed and he did it for a living; and

(4) Could somebody just please admit that they know who Brother Three is in this case?

---

[19] For purposes of clarity, the Court subdivides Ground 3(D) in this Order.

Respondents contend the arguments constitute permissible statements on the evidence presented at trial and Bai forfeited his claim about Argument (3). (ECF Nos. 24 at 30–31; 79 at 42.)

During closing arguments in the guilt phase, defense counsel argued:

> Rumor, hearsay and innuendo. That's what the State has presented to you concerning this supposed Brother Three character. They can pull up his picture, put it next to this young man and somehow that equates to a conspiracy, that somehow equates to a shot caller telling somebody to do something. You've heard no evidence of that whatsoever. All the State has given you, and they were dealt a very difficult hand, is rumors, hearsay and innuendo.
>
> . . . .
>
> The State of Nevada was dealt a difficult hand, a bad hand. We have—and we saw throughout the course of this trial lots of language barriers, cultural distrust of law enforcement, criminal activity, criminal community.

(ECF No. 44-3 at 60, 72.)

During the penalty phase of the trial, Bai's mother testified she did not know Brother Three:

BY [THE PROSECUTOR]:

Q    Ma'am, do you know somebody by the name of Brother Three?

A    I don't know.

Q    You don't know Brother Three?

A    I don't know.

Q    Do you know a guy name Leo Yang?

A    No, I don't know, because my son knows that I have a high blood pressure, hypertension problem, so what's about his work or anything else, he doesn't say much to me other than just telling me he's safe, he's good.

. . . .

Q    If your son asked you to contact a person that he calls Brother Three and tell that person certain information, what would you do if you don't know who it is that you're supposed to be contacting?

A    He never told me.

Q    Ma'am, I'm going to show you—it's marked as State's Proposed Exhibit 242B. You may never have seen that letter before, but you would agree with me that's your son's handwriting?

A    Yes, his handwriting.

Q    And look at the envelope. The envelope is addressed to you.

A    Yes.

. . . .

| | | |
|---|---|---|
| Q | In that letter, your son asks you to contact Brother Three. | |
| A | I don't know. | |
| Q | Well, do you want to read it once to yourself? | |
| A | It didn't—there's no phone number there. It seems like it says he wants me to look for this person. How am I going to do that? There's no telephone number. I don't know. | |
| Q | I think that was kind of my point, ma'am. How would he—why would he be asking you and not providing you any information on how to get ahold of Brother Three if you don't know who Brother Three is? | |
| A | I don't know what he was thinking. I don't have contacts with all these young kids that he hang [sic] out with. | |

(ECF No. 46-4 at 18–19.)

During the penalty phase of the trial, the defense called clinical psychologist Dr. Johnny Wen who testified, among other things, he had "further training in neuropsychology," published in the area of "malingering," and did not "feel" Bai was malingering by falsifying his psychological test scores. On cross-examination, Wen agreed he received documents ostensibly written by officers and inmates in support of Bai and that Wen incorporated some of their words into his report. Wen said that if the documents were falsified, it would not change his "overall opinion" because falsification of the documents supports Wen's opinion that Bai suffers frontal lobe dysfunction. Wen agreed Bai "may have" manipulated him if the letters of support were falsified; although Wen found no evidence that Bai had attempted manipulations in the past. (ECF No. 46-1 at 54, 64, 102–110, 114, 118, 125, 129, 133.)

During the penalty phase of the trial, Metro homicide detective Dolphis Boucher testified he investigated the documents submitted by Bai that were ostensibly authored by officers, and which were given to Wen. Boucher discovered most of the officers did not write the things in support of Bai that were attributed to them, and others who admitted they wrote what was attributed to them had no impression their writings would be used at trial. (ECF No. 46-4 at 38–48, 67–68.)

The defense objected to Arguments (1), (2) and (4) during the prosecutor's rebuttal argument during the penalty phase of the trial:

I heard [defense counsel] talk about an immature kid and redemption, and I don't know, maybe somebody in this room thinks that the man who made a career out of killing people somehow can find redemption, a man who when faced with capital punishment, forget what he did in the guilt phase to the witnesses and the efforts to obscure the truth, but a man who manufactured evidence—there isn't any other way to put it. He manufactured evidence while sitting in a courtroom in front of twelve people who are going to decide his fate, and they tell you that man can find redemption at some point in his life? I mean, at what point do you just say, oh, my God, this is just plain ridiculous what has happened in this courtroom. And a [sic] you know, I took somewhat of an offense of it in guilt phase when [defense counsel] got up and said, hey, it's a tough case for the State, don't blame them but, hey, they just couldn't make it because it was kind of—it was almost funny—

[DEFENSE COUNSEL]: Judge, I'm going to object to Mr. —

[THE PROSECUTOR]: —to hear that.

[DEFENSE COUNSEL]: I'm going to object to the personalization of him objecting to it, of taking offense.

[CO-DEFENSE COUNSEL]: It's not evidence.

THE COURT: Let's don't make my [sic] personal attacks. I'm not saying you were.

[THE PROSECUTOR]: I'm not making a personal attack. I'm going to say—

THE COURT: All right. Let's move on.

[THE PROSECUTOR]: Well, I—what [defense counsel] said in closing, I'll call it funny, ironic considering the nature of the evidence in the guilt phase in this particular case. But now I almost feel like I have to say it . . . I do not think that [the defense attorneys] in any way did anything wrong in this case. And to be honest with you, I don't think Dr. Wen did anything wrong despite the suggestion of everybody else. See, you're not the only people being manipulated. The State's not the only people being manipulated. His own mother, the witnesses, these three guys, Dr. Wen, they're manipulated by their guy too.

[CO-DEFENSE COUNSEL]: Well, I'm going to object that, Your Honor. Again, that is—

THE COURT: No. Overruled.

[CO-DEFENSE COUNSEL]: —improper.

THE COURT: Go ahead. Go ahead . . .

[THE PROSECUTOR]: They didn't do anything wrong here. There's one man responsible for everything that's happened in this courtroom from day one, and it's Xiao Ye Bai. And they're going to suggest to you that somehow he can find redemption or that he's an immature child.

. . . .

His mother got up there and begged for his [sic] child's life and then she couldn't answer a simple question truthfully thereafter. She knows I have the reporting of the phone calls. By God, and by the time Franky got done, everybody had to know that I've heard what was said by Xiao Ye Bai between the time of you

guys leaving to deliberate and the time that you guys came back and gave your verdict. She knew it. It was on there and she just couldn't even accept it. I have a bad memory. Really? Because you remember everything about things that happened 20 years ago and you can't remember what happened when your son got convicted of murder?

. . . .

What else do you know about Ying Chen? Could somebody just please admit that they know who Brother Three is in this case? Is that ever going to happen in this case? I mean, I thought for sure by the time Ying Chen got up there—

[DEFENSE COUNSEL]: Again, Your Honor, it's inappropriate—

[THE PROSECUTOR]: —she can't—

[DEFENSE COUNSEL]: —for him to say what he thinks. It's directed at what the evidence is, Judge.

THE COURT: No.

[THE PROSECUTOR]: I certainly can use that term.

THE COURT: No. I'll overrule the objection.

[BY THE PROSECUTOR]:

Do you—does anybody think that Mr. Bai is going to write his mother a letter saying call Brother Three, not giving her a phone number, not tell her who Brother Three is? I mean, she doesn't know who Brother Three is?

(ECF No. 46-4 at 96–100.)

The Supreme Court of Nevada determined challenged arguments (1), (2), and (4) were permissible expressions of the prosecutor's view of the evidence, and that, although challenged argument (3) was improper, it was not prejudicial:

[B]ai also contends that the following comments, made by the State during the penalty phase, were improper:

1) And you know, I took somewhat of an offense of it in guilt phase when [defense counsel] got up and said, hey, it's a tough case for the State, don't blame them but, hey, they just couldn't make it because it was kind of-it was almost funny.

2) The State's not the only people being manipulated. His own mother, the witnesses, these three guys, Dr. Wen, they're manipulated by their guy too.

3) [C]onsidering how many people he's killed and he did it for a living.

4) What else do you know about Ying Chen? Could somebody just please admit that they know who Brother Three is in this case? Is that ever going to happen in this case? I mean, I thought for sure by the time Ying Chen got up there.

In *State v. Green,* we held:

> The prosecutor ha[s] a right to comment upon the testimony and to ask the jury to draw inferences from the evidence, and has the right to state fully his views as to what the evidence shows. If the prosecutor's reasoning is faulty, such faulty reasoning is subject to the ultimate consideration and determination by the jury. 81 Nev. 173, 176, 400 P.2d 766, 767 (1965) (internal citation omitted).

Here, with exception to the third remark, the State's comments were merely an expression of its views based on the evidence.

> [FN 4] We additionally note that Bai's claims that the State improperly referred to him as a "hitman" and improperly referred to Li's death as a "contract killing," were an allowable expression of the State's view of the case.

As to the third comment, the defense did not object, and thus our review is for plain error. And, although references to past criminal history generally constitute reversible error, *Porter v. State,* 94 Nev. 142, 149, 576 P.2d 275, 279 (1978), under our plain error review, we conclude the evidence of guilt is overwhelming, and thus reversal is not warranted, *see Skiba,* 114 Nev. at 614, 959 P.2d at 960 (1998) (determining that a prosecutor's improper comment did not warrant reversal where evidence of guilt was overwhelming).

(ECF No. 14-6 at 5–11.)

The Supreme Court of Nevada reasonably determined the prosecutor's remarks (1), (2), and (4) did not constitute misconduct. Argument (1) responded to the defense argument during the guilt phase that the case was a difficult one for the State. The trial court confirmed the remark was not a personal attack and the prosecutor explained to the jury it was not a personal attack on Bai's counsel. Argument (2) was fair commentary on the testimony and evidence that Bai submitted writings and signatures that were falsely attributed to correctional officers purportedly supporting Bai; Wen's testimony he may have been manipulated to rely upon those documents for his written report for the penalty phase of the trial; and defense counsel's implicit reliance on them. Argument (2) was also fair commentary on the contents of Bai's letter to his mother requesting she tell potential witnesses what to say, and not say, about the circumstances of the case. Argument (4) was part of the prosecutor's argument that Bai's mother lacked credibility in her testimony that she did not know the significance of, or how to contact, Brother Three. Thus, it is objectively reasonable for the state supreme court to conclude the prosecutor's arguments (1), (2), and (4) were based on reasonable inferences to be drawn from the evidence and did not so infect the trial

with unfairness as to make the resulting conviction a denial of due process. Accordingly, Bai is not entitled to federal habeas relief for Ground 3(D)(1).

### d.      Ground 3(D)(2)—De Novo Review of Penalty Argument (3)

In the penalty phase of Bai's trial, Los Angeles County Sheriff's Department homicide detective Jonas Shipe testified five percipient witnesses said they saw Bai shoot and kill Xi Li ("Mike Li") and shoot and injure Mike Li's friend, Xiaoming Liu, at the Fisherman's Wharf Restaurant in San Gabriel, California on December 4, 2008—about seven months before Bai killed Li in Las Vegas, Nevada. Shipe testified he was informed that victims Mike Li and Liu went to the home of Bai's friend, Mr. Lin, and demanded payment of $10,000 that Lin owed them as proceeds from credit card or identity theft. Thereafter, the victims, Mike Li, and Liu, were at the restaurant when they received a telephone call from Bai, and then Bai, along with Mr. Lin and another individual named Wei Li Liu, arrived at the restaurant, where an altercation ensued, and Bai shot the victims. Shipe said Bai was charged with murder and attempted murder in connection with those incidents. Shipe said he learned Bai was known "as a street fighter, very experienced street fighter" who "competed in China," and there were indications about organized crime in the police reports for the incident. Shipe said Brother Three came up during the investigation, but police did not identify him. Over defense objection, the trial court admitted police reports, including witness statements, for the California incident. Metro forensic firearms/toolmark expert James Krylo testified a ballistics test confirmed nine cartridges found at the scene of the California shooting were fired from the .40 caliber Beretta firearm that Detective Kinser said police found at Bai's residence in July of 2009. (ECF Nos. 43-3 at 41; 45-2 at 43, 48, 56–77.)

The prosecutor urged the jury to consider the California crimes in determining the appropriate sentence in this case:

> And I'd ask you to consider December 4th of 2008, because on that day Mr. Bai heard that there was some type of beef over $10,000; some credit card scam ID theft. And he chose to arm himself with a gun and go to the Fisherman's Wharf in Los Angeles. And when that beef broke out, he pulled out that gun and he shot and killed Mike Lee and injured Mr. Lu. Another life, gone.

> And then he fled to Las Vegas . . . if you believe the exact words from Mr. Bai in his letter, to hide from trouble . . . And did he think about that life that he took? Did he think about Mike Lee's life when he took this video of himself, just

months later, manipulating all of his weapons, taking them apart, taking all the bullets—did he think about that life that he took when we [sic] took pictures of his guns with the black glove giving the camera the finger? Or when he took a picture of the very weapon that killed that man, with the glove pointing down?

. . . .

And when he fled to Las Vegas, he may or not have gotten away with that Los Angeles murder, but you would think that there would be some self-reflection . . . And then you fast-forward to July 6th of 2009, a little more than seven months later. And what's this date? Because the State would submit to you that this is just another day, another bar, and another body for Xiao Ye Bai. But that date is the date that James Li lost his life.

. . . .

There was a lot of talk about when is the death penalty warranted. And something that I kept hearing over and over again is for the worst of the worst. It's reserved for the worst of the worst . . . I mean, is it a body count; is it the amount of people that you kill or the amount of people you hurt? Because at seven months, we're at five people.

He shot and killed Mike Lee; he stabbed and killed James Li. And not only does he kill these people when it's not even his beef—he's not even upset with these people. This is over a beef with other individuals. He just gets involved and does what he wants to do . . . So if it's a body count, you have it.

. . . .

And lastly, on December 4th of 2008, when Xiao Ye Bai took that gun and gunned down Mike Lee at Fisherman's Wharf, he made that decision. And on July 6th of 2009, when he took that knife and walked into KTV Forbes and stabbed James Li 32 times and left him bleeding and dying in a bar, he made that decision.

And . . . when . . . he made those decisions and he chose to take those two men's life [sic], then he should have been willing and prepared to forfeit his own.

(ECF No. 46-4 at 77–80, 84–85, 87.) The defense responded by arguing to the jury that it must not sentence Bai to death based on the crimes in California as Bai was not convicted of those crimes:

Justice isn't killing someone who hasn't been tried or convicted of a crime. And essentially in this case I would submit to you that that's what the State's asking you to do. You're looking at me and saying, [defense counsel], that case in California is deeply troubling to me, we were looking at your client at the beginning of this case and we gave him a fair shake about what occurred but then they hit us with this in this penalty phase, and it's disturbing. But you haven't tried that case. You don't know what happened in that case, and it would be wrong for you to kill someone for that case because there's a jury in California waiting to hear what happened in that case and I would respectfully submit to you you should let them hear the evidence and make a determination as to what really happened. For you in this case right here, to pull the switch on this man, that case, that's wrong.

(Id. at 88.) In rebuttal, the prosecutor argued Bai was unlikely to be acquitted of the California crimes and the jury should consider "how many people he's killed and he did it for a living" in determining the appropriate sentence in this case:

But I'm going to get back to that because [co-defense counsel] started off with, you know, don't give him the death penalty, don't give him justice for his second murder because he hasn't been convicted of his first murder, but take it to its logical conclusion. We're done here. He gets whatever verdict he gets, he gets whatever sentence he gets, and he gets taken back to California. He gets tried. He suggested to you he isn't going to get convicted for that case. I mean, my God, he kept the murder weapon. What's the penalty hearing going to be like in that particular case? . . . Hey, don't punish him for what happened seven months later, this is his first murder, you can't hold that second murder against him for his first murder. So by some fluke of the fact that happened to be the Las Vegas Metropolitan Police Department who caught him here in Las Vegas, he escapes justice because he got lucky that he got caught in Vegas first which happens to be his second murder, so don't consider his first murder. That's the argument that I heard from [defense counsel].

. . . .

Let's talk about the truth because that's what we're here for, is the truth but also justice, and I feel like I don't want to even comment on this because when I started this penalty phase I thought to myself, who the heck is ever going to buy the mitigators that are being presented from Dr. Wen as outweighing the nature of the aggravators in this case, these repeated acts of violence by this particular defendant, and then even if you got past that point and some jury—there's no way they're going to find these mitigators outweigh five aggravators, but even if you got to the last four, then ultimately you could consider some of the mitigators, but considering how many people he's killed and he did it for a living, that it doesn't really matter whether or not he has brain damage, there is a frontal lobe injury, whether or not he was abused as a child, all of that.

(*Id.* at 95–96, 98.)

The Supreme Court of Nevada's determination that Argument (3) in the penalty phase, "[c]onsidering how many people he's killed and he did it for a living," constituted a personal opinion that improperly referenced prior criminal history, was objectively unreasonable in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(d)(2). The state supreme court's analysis shows that it unreasonably failed to account for the procedural and evidentiary context in which the prosecutor made the argument. The state supreme court's analysis relied on two of its cases that considered prosecutorial comments made during the guilt phase of a non-capital trial. *See supra*, at p. 47. Here, Argument (3) was made in rebuttal at the conclusion of the penalty phase of Bai's capital trial. By that point, guilt was established, and the State had permissibly presented evidence related to pending charges, albeit no convictions, against Bai for murder and attempted murder in California. Under these circumstances, it was objectively unreasonable to conclude Argument (3) during the penalty phase constituted an improper reference to prior criminal history. Moreover, because the remark was made in the penalty phase, where the

1   jury's verdict was not about guilt, but required the jury to determine the sentence for the first-
2   degree murder conviction, the Supreme Court of Nevada's determination that Argument (3) was
3   not prejudicial misconduct because of overwhelming evidence of "guilt," constitutes an
4   unreasonable application of clearly established Federal law, as determined by the Supreme Court.
5   28 U.S.C. § 2254(d)(1). The determination of prejudice for prosecutorial misconduct requires a
6   determination "whether the misconduct had a substantial and injurious effect or influence on the
7   determination of the jury's verdict." *Darden,* 477 U.S. at 183. For these reasons, the Court will
8   apply de novo review to the prosecutorial-misconduct claim for Argument (3) in the penalty phase.

9                    **e.      Ground 3(D)(2)(a)—"How many people he killed"[20]**

10         On de novo review, the Court finds the prosecutor's remark "considering how many people
11   he killed," in the context of the penalty phase proceedings and argument, did not constitute
12   personal opinion or an improper reference to prior criminal history. It was, instead, fair
13   commentary on the evidence presented during the guilt and penalty phases of the trial and did not
14   so infect the trial with unfairness as to make the resulting conviction a denial of due process. *See*
15   NRS § 175.552(c)(3), *as amended by* Laws 2007, c. 327, § 16 (providing that during a penalty
16   hearing "evidence may be presented concerning aggravating and mitigating circumstances relative
17   to the offense, defendant or victim and on any other matter which the court deems relevant to
18   sentence, whether or not the evidence is ordinarily admissible."); *Riker v. State,* 111 Nev. 1316,
19   1326–27, 905 P.2d 706, 712 (1995) (holding evidence of uncharged murders admissible after any
20   aggravating circumstance proved beyond a reasonable doubt); *see also Woodson v. North*
21   *Carolina,* 428 U.S. 280, 304 (1976) (holding that the relevant factors to be considered by a jury in
22   imposing a penalty for a capital crime are "the character and record of the individual offender and
23   the circumstances of the particular offense."). Accordingly, Bai is not entitled to federal habeas
24   corpus relief for Ground 3(D)(2)(a).

25

26

27

28        _____
          [20] For purposes of clarity, the Court subdivides Ground 3(D)(2).

1    **f.      Ground 3(D)(2)(b)—"Made a Living at it"**

2          Reasonable jurists could disagree whether the  prosecutor's remark that Bai "made a living

3    at [being a hitman]" was fair commentary on the evidence. Although Pei testified Bai told her they

4    could use the money he obtained from a man who owed him money to pay their rent, it is debatable

5    whether that testimony was a sufficient basis to draw a reasonable inference that Bai used the

6    proceedings from killing individuals, as distinct from using the collection of debts he obtained

7    from individuals, to pay his living expenses. As there was no other evidence to support an inference

8    that Bai received monetary, or any other compensation, or made a "living" in exchange for killing

9    anyone, including Li or the individual in California, it is debatable whether that portion of the

10   argument so infected the penalty phase of the trial with unfairness as to make the resulting

11   sentencing decision a denial of due process.

12         Assuming the remark constitutes misconduct, the Court finds that in the context of this

13   record, the remark did not have a substantial and injurious effect or influence on the determination

14   of the sentencing verdict as to result in a denial of federal due process. As discussed, reasonable

15   inferences could be drawn from the evidence to support the State's theory that Bai killed Li as a

16   hitman for United Bamboo gang. And during the penalty phase, the State presented evidence that

17   five eyewitnesses identified Bai as having shot and killed another individual in California only

18   months before killing Li, and police found the murder weapon in Bai's residence. In the guilt

19   phase, defense counsel argued the State's argument that Bai was a hitman was based on "rumors,

20   hearsay and innuendo" and there was no evidence Brother Three called upon anyone to kill Li.

21   The defense furthermore argued, unlike Bai, a hitman would not have stabbed Li 32-times in a

22   crowded bar without bearing a disguise. The defense argued Bai had not been convicted of the

23   crimes in California. Moreover, the trial court instructed the jury, "[w]hatever counsel may say,

24   you will bear in mind that it is your duty to be governed in your deliberations by the evidence as

25   you understand it and remember it to be and by the law as given to you in these instructions," in

26   determining the appropriate sentence. (ECF No. 46-4 at 76.) Under these circumstances, the

27   prosecutor's remark that Bai "did it for a living" did not have a substantial and injurious effect or

28   influence on the determination of the sentencing verdict as to result in a denial of federal due

process. Accordingly, Bai is not entitled to federal habeas corpus relief for Ground 3(D)(2)(b). The Court will, however, issue a certificate of appealability for Ground 3(D)(2)(b) as Bai has made a substantial showing of the denial of a constitutional right with respect to the prosecutor's argument that Bai killed people "for a living" and reasonable jurists could find this Court's assessment of the constitutional claim debatable or wrong. *Slack*, 529 U.S. at 484.

### 5.      Ground 3(E)—Witness Coaching

Bai contends the prosecutor committed misconduct by coaching Guo to change his testimony "in the hallway" during a recess from Guo's trial examination. Bai contends two court interpreters stated Guo testified Bai told Li to "pay back the money." After the prosecutor met with Guo and the interpreters in the hallway, Bai contends Guo changed his testimony and said he meant he told Li and Bai to "calm down." Respondents contend the prosecutor properly clarified Guo's testimony and did not prejudice the defense. (ECF No. 24 at 31–34; 79 at 43–45; 82 at 33–34.)

The Supreme Court has stated that a trial judge's "[p]ower to control the progress and, within the limits of the adversary system, the shape of the trial includes broad power to sequester witnesses before, during, and after their testimony." *Geders v. United States*, 425 U.S. 80, 87 (1976) (concluding where the witness is the defendant, the trial court's order preventing the defendant from consulting his counsel during a 17-hour overnight trial recess between direct and cross-examination of the defendant was a deprivation of the right to assistance of counsel guaranteed by the Sixth Amendment) (citations omitted); *but see Perry v. Leeke*, 488 U.S. 272, 281–85 (1989) (concluding state trial court's order denying defendant's consultation with counsel during a 15-minute afternoon recess at the conclusion of defendant's direct examination, did not violate the Sixth Amendment right to assistance of counsel, because a defendant has no constitutional right to counsel while the defendant is engaged in testimony).

Just before Guo testified, the trial court instructed the jury, that it would hear testimony in a language other than English and that the witness "will testify through the official court interpreter." The court instructed that, "[a]lthough some of you may know the non-English language used, it is important that all jurors consider the same evidence. Therefore, you must accept the English translation of the witness's testimony. You must disregard any different

meaning . . . ." During Guo's testimony, the interpreters employed a "check interpretation" system whereby a second interpreter was responsible for checking the interpretations of the interpreter assigned to interpret Guo's testimony. Guo testified he saw Li and Bai quarrel before the stabbing:

> Q    So as you're sitting there smoking, facing the big screen, does something happen inside the club?
>
> A    Yes.
>
> Q    And can you describe for ladies and gentlemen of the jury what happened?
>
> INTERPRETER CHEN: Check.
>
> THE WITNESS: I was smoking, facing the screen . . . [Li] was standing next to me—
>
> INTERPRETER CHEN: Check. [Li] all of sudden show up and stand next to me.
>
> THE WITNESS: And then a fellow taller than him and then they were talking. I thought they were friend[s] just hav[ing] a conversation. Okay, I just take a look at them, why they were [sic] talking to each other. After a few seconds, [Li] pull me— to put me in front of him.
>
> INTERPRETER CHEN: Check.
>
> THE WITNESS: [Li] just pull me in front of him.
>
> INTERPRETER CHEN: Check. Just a few seconds later, [Li] pull—the witness was showing this side of his shoulder, the right side of his shoulder. He grabbed me from here and pull me, go kind of get in between them and in front of him.
>
> . . . .
>
> THE WITNESS: He grabbed me here and pulled me over to here in the middle.
>
> [BY THE STATE]:
>
> Q    When that happens, what do you think's going on?
>
> A    The two just keep talking real loud.
>
> Q    And did you hear anything that was being said between the two?
>
> A    No, I didn't know. It looked like they had some type of quarrel.
>
> INTERPRETER CHEN: Check. I feel very intense. I feel like there's going to be a[n] argument or fight. Then I said calm down, calm down. You want to say something, just calm down. And I was doing this, kind of trying to eliminate the tension . . . .

On redirect-examination, the prosecutor requested a translation of an untranslated word contained in Guo's statement to police that were in Mandarin, and the interpreters stated the words were

"wan zi." Guo then testified: "Yeah, I thought they got a [sic] fight because something like wan zi; return the money, return the debt" and two interpreters translated "wan zi" as "pay me back" or "pay back the money." Thereafter, interpreter Chen asked Guo to clarify whether he was next to Li when Li "called" to Guo and pulled-up Guo between Li and Bai. Guo replied, "Yes. Oh, yeah. He called me and then at the same time he pull me up. Yeah." (ECF No. 41-2 at 146–49; 41-4 at 12, 25–27, 48–49.)

The trial court held a recess but did not instruct Guo he may not converse with anyone during that recess. During the recess, the prosecutor argued to the trial court that the interpreters' translations of "quan ji" or "qua zi" or "qui zi" were incorrect and instead those words meant "calm down." The defense noted that [regardless of the words set forth in Guo's statement to police] Guo just testified the men quarreled about paying back money. The prosecutor argued the interpreter, not Guo, stated the men quarreled about paying back money. (*Id.* at 51–53.)

Following the recess, the defense moved for a mistrial claiming the prosecutor tampered with Guo's testimony by meeting with Guo and the interpreters in the hallway during the recess. The prosecutor stated the defense declined an invitation to join in the conference with Guo and the interpreters and that the prosecutor was entitled to talk to the State's witnesses any time. The defense argued the proper way to clarify the witness's testimony is in court on the record. The trial court found no sanctionable conduct as the prosecutor's conference with Guo and the interpreters was for the purpose of clarifying an interpretation rather than coaching. (*Id.* at 59–61.) When the jury returned, the prosecutor asked Guo to clarify his testimony about when Li pulled him between Li and Bai:

Q      Before our little break here, there was a conversation happening about when you first stood up or were pulled up. What did you intend to do at that point?

A      I was pull up and I try to stop the fight.

INTERPRETER YOUNG: Check. His answer say I just want to chin gow. Here we mention chin gow. Chin gow means calm down. I just want to calm down.

BY [THE STATE]:

Q      So the term he uses, chin gow, is calm down?

A      I said don't fight. Don't argue. Don't argue.

Q      And at that point is when the tall man pulled the knife out and stabbed you?

A      Yes.

Q      Did you ever hear any of the words being spoken between the tall guy and James?

A      I don't know. I -- no.

[THE STATE]: Judge, I'd ask the record to reflect that the interpretation where the word money was mentioned by some interpreter . . . was never a word utilized by the witness.

[DEFENSE COUNSEL]: And I would just ask that the record reflect the history that it has reflected and it is what it is.

THE COURT: Sir, did you ever mention money during your testimony? And this is in relationship to your testimony regarding getting pulled up by James.

THE WITNESS: I have not.

THE COURT: And both . . . of our interpreters are under oath, and Madam Interpreter, did the witness during his testimony regarding getting pulled up ever mention money?

INTERPRETER CHEN: No. No, your Honor.

THE COURT: And sir, during—

INTERPRETER YOUNG: Your Honor, no. I did not hear that word.

THE COURT: Okay. All right. Thank you.

On recross-examination, the defense elicited Guo's agreement that he told police "I thought that [Li] argue [sic] with people over money." (*Id.* at 71–76.)

The Supreme Court of Nevada concluded the trial court did not abuse its discretion in allowing the prosecutor to consult with Guo as the consultation concerned a translation issue rather than a substantive change in Guo's testimony:

*Prosecution consulting with witness*

Jian Guo was a prosecution witness, who was standing near Bai and Li prior to Bai's attack, and who was also stabbed by Bai as Li attempted to escape. During Guo's redirect examination, as Guo testified to why Bai may have attacked Li, an interpreter translated the phrase "wan zi" to mean "return the money" or "return the debt." In contrast, the State asserted that the witness was saying "calm down." After a recess, Bai's counsel informed the court that the State conferred with Guo and several of the interpreters. Bai argued that the State was coaching Guo. The district

court determined that the consultation was for clarification, and proceeded with trial.

On appeal, Bai contends that the State's conversation with Guo was prosecutorial misconduct because the conversation impacted the ascertainment of truth. It is generally acceptable for the prosecution to consult with its witness during recess. *See, e.g., United States v. Malik,* 800 F.2d 143, 148–49 (7th Cir. 1986) (finding no error where witness made a substantive correction to testimony after prosecutor privately conferred with witness during recess without authorization from trial court); *State v. Delarosa-Flores,* 799 P.2d 736, 737–38 (Wash. Ct. App. 1990) (holding no abuse of discretion in allowing recess conference between prosecutor and victim even though victim changed testimony after conference because opposing counsel could have attacked that change on cross-examination). Here, we conclude that the district court did not abuse its discretion by allowing the State to consult with Guo during the recess, especially considering that the content of the conversation included a translation issue, not a substantive change in Guo's testimony.

[FN 5] In addition, the district court was within its discretion to change the record to reflect the true translation. *See Int'l Fid. Ins. Co. v. State,* 114 Nev. 1061, 1062, 967 P.2d 804, 805 (1998) ("The district court has broad discretion in addressing its internal matters."); *Riley v. State,* 83 Nev. 282, 285, 429 P.2d 59, 62 (1967) ("[T]he trial court must be accorded discretion to handle emergency situations as they arise during trial.").

(ECF No. 14-6 at 11–12.)

The Supreme Court of Nevada could reasonably determine the prosecutor's conduct did not so infect the trial with unfairness that the resulting conviction constituted a denial of due process. *Richter*, 562 U.S. at 102. The trial court did not instruct Guo that he could not speak with the prosecutor or the interpreters about his testimony during the recess and the defense did not request such an admonition. The record supports the conclusion that the prosecutor's conference with Guo and the interpreters was for the purpose of clarifying Guo's testimony was properly translated; not to alter Guo's testimony. The record also shows Guo did not change his testimony. As the defense repeatedly pointed out, Guo testified he heard Li and Bai quarrel about paying back money. Guo clarified only that Guo said nothing about money during his testimony that Li pulled him between him and Bai before the stabbing. The record supports that clarification and the conclusion that Guo did not repudiate his testimony that he thought Li and Bai quarreled about paying back money. Moreover, the defense had the opportunity to rebut the clarification through cross-examination and through examination of the court interpreters. *Geders,* 425 U.S. at 89–90 (observing that cross-examination is the primary tool for uncovering improper witness coaching).

Notably, the question whether or not Li and Bai had a monetary dispute in Guo's presence favored neither party as Pei and Wang established Li and Bai had an unresolved monetary dispute. The Supreme Court of Nevada's determinations are neither contrary to, nor constitute an unreasonable application of clearly established Federal law as determined by the Supreme Court and are not based on unreasonable determinations of fact in light of the evidence presented in the state-court proceeding. Thus, Bai is not entitled to federal habeas corpus relief for Ground 3(E).

### D.    Ground 4—Juror Misconduct

Bai claims the trial court violated his right to an impartial jury under the Sixth and Fourteenth Amendments by failing to remove Juror 14 before he tainted the trial by blurting out his interpretation of a snippet of Guo's testimony in open court. Bai claims the trial court should have granted a mistrial because Juror 14's actions caused the remaining jurors to rely on evidence outside the record as no other juror understood untranslated Chinese. Respondents contend Bai fails to demonstrate the Supreme Court of Nevada's rejection of this claim was unreasonable. (ECF No. 24 at 33–34; 79 at 45–52; 82 at 34–35.)

The Sixth Amendment guarantees the right to a trial "by an impartial jury." *See Duncan v. Louisiana*, 391 U.S. 145 (1966) (incorporating the Sixth Amendment right to trial by jury into the due-process clause of the Fourteenth Amendment). "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation," but it does mean "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Phillips*, 455 U.S. at 217. "The remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215. Because the Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial, "[w]hen a juror communicates objective extrinsic facts regarding the defendant or the alleged crimes to other jurors, the juror becomes an unsworn witness within the meaning of the Confrontation Clause." *Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997), *overruled on other grounds by Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012). If a court determines that a juror has improperly brought extraneous information to the jury's attention, the inquiry must focus

on whether "there is a reasonable possibility that the extraneous information could have affected the verdict." *United States v. Montes*, 628 F.3d 1183, 1187 (9th Cir. 2011) (citing *United States v. Keating,* 147 F.3d 895, 900 (1998)). "This inquiry is an objective one: 'we need not ascertain whether the extraneous information actually influenced any specific juror.'" *Id.* (citing *Keating*, 147 F.3d at 901–02).

The Ninth Circuit Court of Appeals recently held Nevada's test to evaluate juror misconduct is neither contrary to nor constitutes an unreasonable application of clearly established Federal law as determined by the Supreme Court. *Von Tobel v. Benedetti*, 975 F.3d 849, 851 (9th Cir. 2020). In Nevada, a defendant is not entitled to a new trial based on allegations of juror misconduct unless it is shown that juror misconduct (1) occurred and (2) it prejudiced the defendant. *Meyer v. State,* 119 Nev. 554, 561, 80 P.3d 447, 453 (2003). To show prejudice, it must be shown "there is a reasonable probability or likelihood that the juror misconduct affected the verdict." *Id.* at 455. In egregious cases, such as jury tampering, prejudice is conclusively presumed without the defendant's having to show prejudice; in non-egregious cases, the defendant has the burden to show prejudice. *Id.* at 455–56. The Nevada Supreme Court defines a reasonable probability as a "probability sufficient to undermine confidence in the outcome." *Lobato v. State*, 120 Nev. 512, 96 P.3d 765, 772 (2004) (quoting *Strickland*, 466 U.S. at 694).

Here, the trial court instructed the jurors they must only rely upon translations of the court's interpreters for testimony given in a language other than English, and must not re-translate the witness testimony for other jurors:

> During this trial, some testimony may be given in another language. An interpreter will provide a translation for you at the time that the testimony is given. You must rely on the translation provided by the interpreter even if you understand the language spoken by the witness. Do not re-translate any testimony for other jurors. If you believe that a court interpreter translated testimony incorrectly, let me know immediately by raising your hand and providing me with a note as to what you feel was improperly translated.

Following Wang's testimony, Second Alternate Juror 14 notified the trial court that the court interpreter assisting Wang on "five or six occasions," "only got like 80 percent of the actual meaning," causing witness confusion and giving the witness "the wrong idea." Juror 14 confirmed he did "not at all" discuss this with fellow jurors. The State agreed Juror 14 "probably" should not

deliberate but it was inappropriate to excuse Juror 14 if the court admonished the juror not to discuss the juror's interpretations with other jurors. The defense argued this may not be an issue unless Juror 14 reaches deliberations. The trial court admonished Juror 14 to notify the trial court if he believed the court's interpreters were not interpreting correctly; not to discuss with fellow jurors the view that perhaps the interpreters were only getting 80 percent of the questions and answers; that even if the juror disagreed with an interpretation, he must "go with" the "certified interpreter's translation"; and if the juror deliberated, the juror could not tell the other jurors that the witness stated something other than what the court interpreter stated the witness said in their testimony. The defense moved to strike Juror 14 because the juror was being asked to "simultaneously listen to the interpreter and to listen to the witness" and "it's a difficult thing" for the juror to do. One court interpreter said their interpretations were correct, but acknowledged there were times when a direct translation word-by-word is impossible, and interpreters must use two or three sentences to explain the meaning of legal terms because there are no direct translations. The court agreed to adopt the defense's suggestion that the interpreters employ the "check interpretation" system whereby a second interpreter would provide alternative interpretations where appropriate. During Guo's subsequent testimony describing the moments before Li was stabbed, Juror 14 joined in the court interpreters' interpretations of Guo's testimony by stating in open court, "That means he's shouting while grab him. He's shouting his name and grab him" and "Loudly shouting at him." The trial court granted the motion to release Juror 14. The defense did not request an evidentiary hearing to further canvass Juror 14, or any of the other jurors, and did not request a curative instruction, or move for mistrial. (ECF Nos. 33-1 at 91; 41-2 at 21, 70, 138–49; 41-4 at 49, 58–59; 41-3.)

In his state-court direct appeal, Bai asserted the trial court erred in denying the defense motion for mistrial and argued the juror's misconduct was sufficient to warrant a mistrial. (ECF No. 47-31 at 68 n.4). The Supreme Court of Nevada held the trial court did not abuse its discretion in denying a motion for mistrial:

*Juror misconduct*

Juror fourteen was a Mandarin and Cantonese interpreter. During Guo's

testimony, frustrated with the court interpreters, the juror blurted out his own translation of a statement made by Guo. After Bai objected and moved for a new trial, the district court removed the juror. Bai contends that the district court abused its discretion by refusing to grant a new trial based on the juror misconduct. The State contends that the misconduct was not prejudicial and therefore does not warrant reversal.

"A denial of a motion for a new trial based upon juror misconduct will be upheld absent an abuse of discretion by the district court." *Meyer v. State,* 119 Nev. 554, 561, 80 P.3d 447, 453 (2003). "Nonetheless, [n]ot every incidence of juror misconduct requires the granting of a motion for [a] new trial." *Id.* at 562, 80 P.3d at 453 (alterations in original) (internal quotations omitted). The facts of each case and "the degree and pervasiveness of the prejudicial influence" are essential to the determination. *Id.* If a reasonable probability exists that a juror's misconduct influenced the verdict, then the conduct was prejudicial. *Id.* at 564, 80 P.3d at 455.

In this case, juror fourteen's interjection during Guo's testimony that the true translation was that Li was "shouting" and grabbing Guo, and not that Li "called" Guo while grabbing him, is highly unlikely to have influenced the verdict. Guo was testifying to what occurred just before Bai stabbed Li. Guo explained that Li grabbed and moved him in front of Bai while calling (or shouting) his name. We conclude that the difference in whether Li called or shouted Guo's name before he was stabbed has no bearing on whether Bai committed any of the crimes for which he was convicted. Therefore, the juror misconduct was not prejudicial and the district court did not abuse its discretion by denying Bai's motion for a new trial.

(ECF No. 14-6 at 12–13.)

The Supreme Court of Nevada reasonably determined there is no reasonable probability or likelihood that Juror 14's sharing his translation of the snippet of Guo's testimony in open court had a substantial or injurious effect or influence on the verdict. Alternate Juror 14's interpretation of Guo's testimony that Guo said Li was loudly shouting, rather than calling, Guo's name while grabbing him before Bai stabbed them, was immaterial to the determination of guilt or innocence and did not materially contradict the translations of the court interpreters. Moreover, the defense requested neither a mistrial,[21] a curative instruction, nor further canvas of Juror 14, or any other juror, about the spontaneous translation. The Supreme Court of Nevada's determination that Bai was not prejudiced by the juror's misconduct is neither contrary to, nor constitutes an unreasonable application of clearly established Federal law, as determined by the Supreme Court, and is not

---

[21] The state court record of the trial proceedings confirms neither party, nor the trial court, suggested mistrial was appropriate based on Juror 14's conduct. The trial court denied the defense motion to release Juror 14 after the trial court's initial canvas of the juror, but the defense did not move for mistrial. After Juror 14 spontaneously interpreted the snippet of Guo's testimony in open court, the defense renewed the motion to release the juror, but did not move for mistrial, and the trial court released Juror 14. This clarification does not affect the Court's review.

based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Bai is not entitled to federal habeas corpus relief for Ground 4.

### E.      Ground 5—Effective Assistance of Trial Counsel

Bai alleges trial counsel were ineffective[22] in violation of the Sixth and Fourteenth Amendments in failing to (A) secure the testimony of Bai's father; and (B) properly notice the topic of expert witness testimony. (ECF No. 24 at 34–38; 79 at 52–60; 82 at 35–41.)

### 1.      Standards for Effective-Assistance-of-Counsel

On a petitioner's claims of ineffective assistance of counsel, he must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is a petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). A petitioner making an ineffective assistance claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. When considering an ineffective assistance of counsel claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* at 689. In considering such claims, a court is obligated to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. On the performance prong, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *Id.* at 689–90. Strategic choices made "after thorough investigation of law and facts

---

[22] Bai was assisted by three trial attorneys. (ECF No. 41-2 at 7.)

relevant to plausible options are virtually unchallengeable." *Id.* On the other hand, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *See Richter,* 562 U.S. at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

### 2.   Ground 5(A)—Failure to Secure Testimony of Bai's Father

Bai claims trial counsel were ineffective in failing to earlier secure the testimony of his father and that this prejudiced him during the guilt and penalty phases for the same reasons set forth in Ground 1(A). Respondents contend trial counsel made reasonable attempts to procure the testimony of Bai's father and the failure to do so was not prejudicial because others supplied the testimony sought from Bai's father. (ECF Nos. 24 at 35–36; 79 at 52–57; 82 at 35–39.)

The primary background for this claim is set forth in Ground 1(A). *See supra*, at pp. 11–15. On the first day of trial, the defense requested reconsideration of the denial of the defense motion for a trial continuance. Bai's counsel explained the case is unique because the witnesses and most of the childhood events occurred in mainland China, and efforts to obtain funds to send an investigator to China were denied. Counsel resorted to "trying to use people that were traveling to China." Counsel said Bai's father was unwilling to speak with counsel until after Bai's mother went to China in the September before trial and convinced Bai's father to talk with counsel. The trial court found defense counsel was not dilatory because counsel could not be ineffective if others were uncooperative, but declined reconsideration of the motion for continuance because there were avenues for connecting with Bai's father during three years of trial preparation, there was no guarantee Bai's father would obtain a travel visa within the lengthy continuance period that was requested, and alternatives existed for presenting the testimony. (ECF No. 38-12 at 4–14.)

The Supreme Court of Nevada determined counsel's performance was neither deficient nor prejudicial:

> To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and that prejudice resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington,* 466 U.S. 668, 687–88 (1984); *Warden v. Lyons,* 100 Nev. 430, 432–33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*); *see also Kirksey v. State,* 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996) (applying *Strickland* to claims of ineffective assistance of appellate counsel). The petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004), and both components of the inquiry must be shown, *Strickland,* 466 U.S. at 697. For purposes of the deficiency prong, counsel is strongly presumed to have provided adequate assistance and exercised reasonable professional judgment in all significant decisions. *Id.* at 690. The petitioner is entitled to an evidentiary hearing when the claims asserted are supported by specific factual allegations that are not belied or repelled by the record and that, if true, would entitle the petitioner to relief. *See Niha v. State,* 124 Nev. 1272, 1300–01, 198 P.3d 839, 858 (2008).
>
> . . . .
>
> Bai [a]rgues that trial counsel should have investigated his father and secured his attendance at trial. He argues that his father could have testified during the guilt phase about his childhood abuse, brain injury, and a debt the victim owed to his father. Bai, however, concedes that trial counsel requested a continuance and sought funding to procure his father's appearance and that his father had refused to cooperate with counsel's efforts. Bai merely speculates that counsel should have undertaken other unspecified actions in this regard and thus does not show that counsel's performance was objectively unreasonable. Further, as another witness testified that Bai's father loaned the victim the money and counsel made a strategic decision not to focus the defense theory of the case on Bai's childhood abuse and brain injury, Bai has not shown prejudice. The district court therefore did not err in denying this claim without an evidentiary hearing.

(ECF No. 14-15 at 2–4.)

The Supreme Court of Nevada's determination that there is no reasonable probability the result of the proceeding would have been different had trial counsel earlier secured the testimony of Bai's father was objectively reasonable. As stated in Ground 1(A), the defense presented the desired testimony through other witnesses. Yong testified in the guilt phase of the trial about the alleged debt Li owed to Bai's father. Bai's mother testified during the penalty phase of the trial about Bai's father's beatings. The Supreme Court of Nevada's determination was neither contrary to, nor constitutes an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in light of

the evidence presented in the state-court proceeding. Bai is not entitled to federal habeas corpus relief for Ground 5(A).

### 3.    Ground 5(B)—Failure to Properly Notice Expert Witness Testimony

Bai alleges trial counsel were prejudicially ineffective in failing to disclose the defense expert would testify about flight-or-flight response because, without the expert testimony, the jury was deprived of an explanation for Bai's sudden violent conduct as an alternative to the State's theory that Bai killed Li in his capacity as a gang hitman. Bai contends there is a reasonable probability the jury would have convicted him of a lesser-included offense had counsel properly noticed and presented the expert testimony. Respondents contend trial counsel made a strategic decision to refrain from introducing details about the expert testimony and Bai is not prejudiced due to overwhelming evidence of guilt. (ECF Nos. 24 at 37–38; 79 at 58–60.)

During the guilt phase of the trial, the State objected to the defense calling an expert witness because "when I look [sic] their expert notice, each and every one of them look like a mitigation expert with the exception of Dr. Chamber who is referenced as an eye-witness ID person and I have no reports, no underlying data, nor do I have any information or any basis to believe that there's anything relevant that any doctor could say at this point in time." Defense counsel asserted the defense noticed Drs. Chambers and Roitman and made an offer of proof:

> [DEFENSE COUNSEL]: Okay. There is a well[-]known and accepted syndrome called the Flight or Fight Syndrome. I've introduced this type of testimony in other cases concerning stabbings, shootings, et cetera. If a person gets worked up, he or she may go well beyond the mark. Not stab somebody once or twice, but 32 times. They overreact. Can go—stab other people. I would submit to the Court that there is no dispute in the scientific community concerning Flight or Fight Syndrome and that's the majority of what either one of these gentlemen would testify to. So Mr. DiGiacomo has a full notice of what I intend to call either Dr. Roitman or Dr. Chambers for.

The State argued it "had zero notice that there would be a guilt phase person to talk about fight or flight . . . ." Defense counsel asserted a strategic decision was made not to get into specifics so as to avoid opening the door to evidence of the "the LA issue," i.e., the alleged murder in California. The trial court excluded the proffered expert testimony finding the proffer was "outside the scope of the notice of expert witness." (ECF No. 43-3 at 180–89.)

The Supreme Court of Nevada concluded counsel's performance was deficient, but Bai failed to establish prejudice:

> Bai next argues that trial counsel should have properly noticed the defense expert who would testify regarding the fight or flight response. Bai correctly observes that counsel performed deficiently in failing to provide adequate notice of the subject matter of the expert's anticipated testimony. Bai has not, however, shown prejudice.
>
> Proffering a fight or flight defense would not have led to a reasonable probability of a different outcome, where Bai initiated the encounter and approached the victim with a knife mere days after kidnapping and beating the victim and demanding repayment of a debt. Further, as counsel explained that they made a strategic decision not to have the expert meet with Bai in order to avoid opening the door to other highly prejudicial evidence, the expert would only be able to discuss the fight or flight response in general terms, such that omission of this testimony does not undermine our confidence in the jury's verdict. *See Strickland,* 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome."). The district court therefore did not err in denying this claim without an evidentiary hearing.

(ECF No. 14-15 at 4.)

The Supreme Court of Nevada's determination that there is no reasonable probability the result the result of the proceedings would have been different had counsel noticed the expert would testify about fight-or-flight response, is objectively reasonable. The significance of the argument that Bai was prompted to kill Li due to fight-or-flight response was diminished, if not entirely negated, by evidence that showed the killing was deliberate, premeditated, and conducted during the course of a burglary (first-degree felony-murder). In May of 2009, Bai beat Li at the 99 Ranch Market and threatened to break his legs if he did not pay Bai $10,000. Bai actively searched for, and enlisted others to search for, Li for several weeks after Li failed to pay the money. Bai confronted Li with a weapon as soon as Bai located Li at Forbes KTV. Bai chased Li and stabbed him to his death within minutes of confronting Li at the nightclub. Bai fled on a bus to another state until he was caught by police. The Supreme Court of Nevada's determination is neither contrary to, nor constitutes an unreasonable application of Federal law, as determined by the Supreme Court, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. Bai is not entitled to federal habeas relief for Ground 5(B).

**F.      Ground 6—Effective Assistance of Appellate Counsel**

Bai alleges appellate counsel provided ineffective assistance in violation of the Fifth, Sixth, and Fourteenth Amendments by failing to challenge the sufficiency of the evidence to support the conviction for attempted murder with use of a deadly weapon of Jian Guo on the grounds that there is no evidence Bai intended to kill Guo. Respondents contend appellate counsel's performance was neither deficient nor prejudicial. (ECF Nos. 24 at 38–39; 79 at 60–63; 82 at 41–43.)

To prevail on an ineffective assistance of appellate counsel claim, a petitioner "must show a reasonable probability that, but for his counsel's [unreasonable performance], he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them to maximize the likelihood of success on appeal." *Id.* at 288 (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). The Ninth Circuit Court of Appeals has explained that in applying *Strickland*'s two prongs to a claim of ineffective assistance of appellate counsel:

> These two prongs partially overlap when evaluating the performance of appellate counsel. In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason—because she declined to raise a weak issue.

*Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (internal citations and footnotes omitted). In other words, failure to raise a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice for the same reason—the issue had little or no likelihood of success on appeal. *Id.*

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)). A jury verdict must stand if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could find the essential elements of the offense beyond a reasonable doubt." *Id.* at 319 (emphasis in original). The *Jackson* standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. A reviewing court, "faced with a record of historical facts that

supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any conflicts in favor of the prosecution and must defer to that resolution." *Id.* at 326. Where circumstantial evidence is used to establish guilt, the Supreme Court has held that it is "intrinsically no different from testimonial evidence" because although "circumstantial evidence may in some cases point to a wholly incorrect result" this is "equally true of testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954) (rejecting contention that circumstantial evidence must exclude every hypothesis but that of guilt). "In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." *Id; see also Jackson*, 443 U.S. at 324–25 (finding circumstantial evidence sufficient to prove specific intent to kill for first-degree murder conviction).

In Nevada, "[a]ttempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill." *Keys v. State*, 104 Nev. 736, 740, 766 P.2d 270, 273 (1988). "[T]he doctrine of transferred intent was created to avoid the specific intent requirement and thus hold the defendant accountable for the consequences of his behavior when he injures an unintended victim." *Ochoa v. State*, 115 Nev. 194, 198, 981 P.2d 1201, 1204 (1999) (citation omitted). "The doctrine of transferred intent is applicable to all crimes where an unintended victim is harmed as a result of the specific intent to harm an intended victim whether or not the intended victim is injured." *Id.* at 200, 981 P.2d at 1205.

The Supreme Court of Nevada determined appellate counsel's failure to challenge the sufficiency of the evidence for attempted murder of Guo was neither deficient nor prejudicial:

> Bai next argues that appellate counsel should have challenged the sufficiency of the evidence supporting his conviction for the attempted murder of Mr. Guo because he did not intend to kill Guo. Guo was stabbed non-fatally in the course of Bai's stabbing his intended victim. As the State produced sufficient evidence of Bai's intent to kill the intended victim, the doctrine of transferred intent supported an attempted murder conviction regarding Guo. *See Ochoa v. State,* 115 Nev. 194, 200, 981 P.2d 1201, 1205 (1999). Bai has not shown deficient performance or prejudice in appellate counsel's omitting a meritless challenge on

this basis. The district court therefore did not err in denying this claim without an evidentiary hearing.

(ECF No. 14-15 at 5.)

The Supreme Court of Nevada's determinations are neither contrary to, nor constitute unreasonable applications of Federal law, as determined by the Supreme Court, and are not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. The record supports the finding there was evidence Bai specifically intended to kill Li. Bai beat and kidnapped Li at the 99 Ranch Market. Bai actively searched for Li until he found him at the Forbes KTV karaoke bar. Upon locating Li, Bai confronted Li with a weapon. Li grabbed Guo and placed him between Li and Bai. Bai drew a knife and slashed Guo, and when Guo departed, Bai immediately chased Li and stabbed him multiple times to his death. Based on the direct and circumstantial evidence presented at trial, a rational jury could infer Bai specifically intended to kill Li, and Bai intended to and was attempting to stab Li, who was behind Guo, when Bai instead stabbed Guo. Based on the evidence, and the doctrine of transferred intent, an objectively reasonable appellate attorney could conclude a claim of insufficient evidence to support the conviction for attempted murder of Guo was without merit, and there is no reasonable probability the result of the appeal would have been different had Bai's appellate counsel raised the claim on direct appeal. Bai is not entitled to federal habeas corpus relief for Ground 6.

### G.     Ground 7—Cumulative Error

Bai alleges the cumulative effect of the trial court's rulings and prosecutorial misconduct concerning the presentation of gang testimony and argument that Bai was a hitman for a gang, along with trial counsel's failure to secure the testimony of Bai's father for trial to refute that theory, resulted in a denial of Bai's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 24 at 39–40; 79 at 63–64; 82 at 43–44.)

"The Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair . . . even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927–28 (9th Cir. 2007) (citing *Chambers*, 410 U.S. at 290, 298, 302–03 n.3). "[C]umulative error warrants habeas relief only where the errors have 'so

infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (citing *DeChristoforo*, 416 U.S. at 643.) "Such 'infection' occurs where the combined effect of the errors had a 'substantial and injurious effect or influence on the jury's verdict.'" *Id.* (citing *Brecht*, 507 U.S. at 637.)

In Bai's direct appeal in state court, he asserted he was denied fundamental fairness and a constitutionally reliable verdict based on the cumulative effect of (1) the alleged trial court errors and prosecutorial misconduct related to the presentation of gang evidence; (2) argument that Bai killed Li in his capacity as a gang-hitman; (3) the trial court's failure to grant a trial continuance to secure the testimony of Bai's father to refute the State's theory; (4) Juror 14's misconduct; and (5) Pei's interpretation of Bai's letter to his mother. (ECF No. 47-31 at 89–90.) The Supreme Court of Nevada noted, "Bai's final contentions are . . . that cumulative error warrants reversal. We conclude that these arguments lack merit and thus do not warrant reversal." (ECF No. 14-6 at 16 n.7.) In Bai's appeal from the denial of his postconviction review petition, he claimed cumulative error based on the errors of trial and appellate counsel. (ECF No. 48-31 at 26.) The Supreme Court of Nevada denied the claim concluding: "Even assuming that multiple deficiencies in counsel's performance may be cumulated to demonstrate prejudice in a postconviction context, *see McConnell v. State,* 125 Nev. 243, 259, 212 P.3d 307, 318 (2009), Bai has not demonstrated multiple instances of deficient performance to cumulate." (ECF No. 14-15 at 6.)

The Supreme Court of Nevada's determinations are neither contrary to nor constitute unreasonable applications of clearly established Supreme Court authority and are not based on an unreasonable determination of the facts, as there are no errors to cumulate that denied Bai a fundamentally fair trial. Bai is not entitled to relief for Ground 7. The Court will, however, issue a certificate of appealability for Ground 7 because it follows that jurists of reason could debate the correctness of the Court's decision that the state supreme court reasonably determined there is no cumulative error given the issuance of a certificate of appealability for Grounds 1(A)(1), 1(B), 2(A), 2(B), and 3(D)(2)(b). *See Slack*, 529 U.S. at 484.

## V.    Certificate of Appealability

This is a final order adverse to Bai. Rule 11 of the Rules Governing Section 2254 Cases

requires this Court to issue or deny a certificate of appealability ("COA"). This Court therefore has sua sponte evaluated the claims within the petition for suitability for the issuance of a COA. See 28 U.S.C. § 2253(c)(1)(A); *Calderon*, 281 F.3d at 864–65. Under § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. Applying this standard, and for the reasons set forth in this Order, the Court finds a certificate of appealability is warranted for Grounds 1(A)(1), 1(B), 2(A), 2(B), 3(D)(2)(b), and 7 of the petition.

## VI.   Conclusion

**IT IS THEREFORE ORDERED:**

1.   The petition (ECF No. 24) is **DENIED**.

2.   A certificate of appealability is **DENIED** for Grounds 1(A)(2), 2(C), 2(D), 3(A), 3(B), 3(C), 3(D)(1), 3(D)(2)(a), 3(E), 4, 5, and 6.

3.   A certificate of appealability is **GRANTED** for Grounds 1(A)(1), 1(B), 2(A), 2(B), 3(D)(2)(b), and 7.

4.   All requests for an evidentiary hearing are **DENIED**.

5.   The Clerk of Court is directed to substitute Brian Williams for Respondent Calvin Johnson.

6.   The Clerk of Court is directed to enter a final judgment in favor of Respondents and against Bai dismissing this action with prejudice and close this case.

DATED: August 7, 2023

KENT J. DAWSON
UNITED STATES DISTRICT JUDGE